696 A.2d 137

REDLAND SOCCER CLUB, INC., Richard V. Spong, Sr., Richard V. Spong, Jr., Geoffrey T. Morrow, Meredith S. Morrow, Robert E. Kane, Herbert D. Myers, David A. Kupp, Patricia K. Dorwart, Larry R. Smart, Crystal Smart, Bretni Brink, Ryan Brink, Joseph Brtalik, Carole G. Brtalik, Joseph J. Brtalik, Brian Brtalik, Wendy Brtalik, Theodore F. Burd, Diane M. Burd, Christopher T. Burd, Dewitt J. Cline, Jr., Jan M. Cline, Eric J. Cline, Jeromy J. Cline, Ronald W. Danner, Danielle M. Danner, Craig A. Danner, Steven W. Haas, Irma L. Rodgers–Haas, Anthony M. Rodgers, Nicole C. Rodgers, Lawrence E. Hager, Ruth A. Hager, Samuel Hager, Benjamin Hager, Shawn Hager, Edward C. Hockenberry, Mary L. Hockenberry, Brett R. Hockenberry, Roger L. Hockenberry, Patricia D. Hockenberry,

Keric L. Hockenberry, Kodi S. Hockenberry, Klint D. Hockenberry, David G. Hooper, Priscilla G. Hooper, David G. Hooper, II, John H. Knaub, Deborah J. Knaub, Derek J. Knaub, Sean M. Knaub, Thomas R. Krause, Robert A. Krause, Richard H. Lebo, Donna Lebo, Trisha Lebo, Kristina Lebo, Ralph E. McCarty, Gale P. McCarty, Joshua H. McCarty, Lucas P. McCarty, James P. Meyers, Kim J. Meyers, Samantha Meyers, Brett Meyers, Thomas M. Morrow, Gregory M. Morrow, Jack E. Muth, Kathleen L. Muth, Robert C. Muth, John A. Nace, Jr., Linda M. Nace, Michael Nace, Robert Nace, Kenneth E. Nace, Pamela R. Nace, Jeremy M. Nace, Kevin E. Nace, Melissa A. Nace, Dean G. Newhouse, Norma J. Newhouse, Martin Newhouse, Eric Newhouse, Benjamin Newhouse, Alice O'Neill, Peter P. O'Neill, Peter O'Neill, Patrick O'Neill, Paul O'Neill, Patricia A. Palm, Dylan T. Buckwalter, Michelle A. Buckwalter, Robert J. Pontius, Cindy L. Pontius, Jay Pontius, Debra S. Popp, Andrew J. Popp, Thomas M. Rados, William P. Rehm, Jr., Kimberly A. Rehm, David A. Rehm, Andar A. Rehm, Deon J. Rehm, Michelle D. Rehm, Ken Ribble, Susan Ribble, Scott Ribble, Mark Ribble, Nevin C. Schenck, Jr., Lisa L. Shenck, Nathan S. Shenck, Aaron M. Shenck, Rebecca Shenck, Bradley Shirk, Julia A. Spong, Nathan M. Spong, Joelle L. Spong, Barry L. Stone, Matthew D. Stone, Corey J. Stroman, Donna L. Szoszorek, Shannon M. Szoszorek, Shayna M. Szoszorek, Eugene Torbek, Erik P. Torbek, Donald Williamson, Elizabeth M. Williamson, Michael Williamson, William B. Wirt, Pamela A. Wirt, Christine E. Wirt, Kevin M. Wirt, Timothy B. Wirt, Bryan C. Wirt, Burlin Covert, Joseph Dorwart, III, Joseph Dorwart IV, Alicia Dorwart, Brent Dorwart, Jack H. Hershberger, Jr., June Hershberger, Carl Smart, Jeffrey Smart, Glen Diller, Dale Kahler, Terrence L. Kemberling, R. Robert McCollum, Wilber Yorty, Appellees,

v.

DEPARTMENT OF THE ARMY AND DEPARTMENT OF DEFENSE OF THE UNITED STATES of America, Appellants.

Supreme Court of Pennsylvania.

Argued Dec. 10, 1996.

Decided May 21, 1997.

180

Margaret Jane Mahoney, Wynnewood, John Adam Bain, John T. Stahr, Washington D.C., pro hac vice, for U.S. Army & Dept. of Defense.

Laurence W. Dague, Raja G. Rajan, Camp Hill, Marvin Beshore, Harrisburg, for Redland Soccer Club, Inc., et al.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION

NEWMAN, Justice.

Appellees, Redland Soccer Club, *et al*, (collectively the Redland Plaintiffs) brought this private civil action against Appellants, the Department of the Army and the Department of Defense of the United States of America (collectively the Army), pursuant to the Pennsylvania Hazardous Sites Cleanup Act, Act of October 18, 1988, P.L. 756, No. 108, as amended, 35 P.S. § 6020.101, *et seq.* (HSCA). The Redland Plaintiffs allege that the Army's disposal of hazardous materials at a site formerly part of the New Cumberland Army Depot (Depot) in south-central Pennsylvania caused them harm. They are seeking, among other things, a medical monitoring trust fund and attorney fees. The Court of Common Pleas of York County granted summary judgment in favor of the Army, and the Superior Court affirmed in part, reversed in part, and remanded the case for further proceedings. For the reasons that follow, we affirm in part, reverse in part, and remand.

## FACTS AND PROCEDURAL HISTORY

The Depot encompasses more than 800 acres of land located approximately five miles south of Harrisburg in Fairview Township, York County. From 1917 until sometime in the 1950's, the Army used four to five acres of a fourteen-acre

tract in the southeastern corner of the Depot as a landfill to dispose of various kinds of waste. After closing the landfill in the 1950's, the Army covered it with a layer of soil and coal ashes.

In 1976, the Army transferred ownership of the fourteen-acre tract to Fairview Township. Fairview Township employees converted the tract into Marsh Run Park (Park) by grading the site and adding a layer of topsoil. Soccer fields were placed in the Park, and Redland Soccer Club and its members used the fields for soccer practices and games from 1982 until 1987.

The Army began environmental testing in the Park in April of 1987, as part of the Defense Environmental Restoration Program. After preliminary testing indicated that hazardous substances were present, the Army closed the Park in August of 1987. Further testing revealed that the Park was contaminated with numerous toxic materials, including volatile organic compounds, semi-volatile organic compounds, and metals. Subsequently, the Army began a program to remediate the contamination.

### Federal Action

On June 7, 1990, five of the Redland Plaintiffs filed a class action complaint in the United States District Court for the Middle District of Pennsylvania (federal action). After the court denied class certification, the five plaintiffs filed an amended complaint joining the additional Redland Plaintiffs. The Redland Plaintiffs consist of three groups: (1) children and their family members who participated in soccer activities in the Park; (2) Fairview Township employees who prepared the Park for the Township's use; and (3) residents living near the Park and relatives who regularly visited them.[1] They

---

1. The District Court consolidated the action by the Redland Plaintiffs with an action by Todd and Tracey Elliot, and their parents. Todd and Tracey attended soccer activities in the Park. Todd has enlarged lymph nodes and Tracey suffers from leukemia. The Elliot children were the only plaintiffs to allege actual physical injury resulting from exposure to hazardous substances in the Park. Neither of these children, however, is a plaintiff in the present action.

sought relief under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, HSCA, and through a common law claim under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.* They requested, among other things, the establishment of a medical monitoring trust fund to pay for periodic physical examinations, and attorney fees.

In a series of opinions, the District Court dismissed all of the Redland Plaintiffs' medical monitoring claims. First, in a Memorandum Opinion, the District Court held that medical monitoring costs were not recoverable under CERCLA and granted the Army's motion for judgment on the pleadings for that claim. *Redland Soccer Club, Inc. v. Department of the Army*, No. 1:CV–90–1072 (M.D.Pa. Feb. 12, 1992). In a second Opinion, the District Court dismissed the HSCA medical monitoring claim without prejudice, holding that CERCLA, 42 U.S.C. § 9613(h), prohibited it from exercising jurisdiction of that claim while a cleanup operation was ongoing. *Redland Soccer Club, Inc. v. Department of the Army*, 801 F.Supp. 1432 (M.D.Pa.1992). In a third Opinion, the District Court addressed the FTCA common law claim for medical monitoring. *Redland Soccer Club, Inc. v. Department of the Army*, 835 F.Supp. 803 (M.D.Pa.1993). The court concluded that the Pennsylvania Supreme Court would recognize a common law cause of action for medical monitoring. However, the court held that the Redland Plaintiffs failed to present sufficient evidence of their exposure to the hazardous substances in the Park and granted the Army's motion for summary judgment on the FTCA common law claim for medical monitoring.

On May 15, 1995, the United States Court of Appeals for the Third Circuit affirmed the District Court's dismissal of the claims for medical monitoring, but on different grounds than the District Court. *Redland Soccer Club, Inc. v. Department of the Army*, 55 F.3d 827 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 772, 133 L.Ed.2d 725 (1996). The Third Circuit held that the Redland Plaintiffs had presented sufficient evidence of exposure to hazardous substances in the Park. However, the court also held that the Redland Plain-

tiffs were required to demonstrate a need for special medical monitoring, i.e., medical monitoring different from the regular medical monitoring recommended for the general population absent such exposure. The court then decided that the Redland Plaintiffs had not presented sufficient evidence of a need for special medical monitoring to withstand the Army's motion for summary judgment.

## State Action

After the District Court dismissed the HSCA claim for medical monitoring, the Redland Plaintiffs filed the present action in the Court of Common Pleas of York County (trial court) on November 27, 1992. They alleged a cause of action under HSCA, seeking, among other things, a medical monitoring trust fund and attorney fees. On April 21, 1994, the trial court granted summary judgment in favor of the Army, holding that although HSCA permits a claim for medical monitoring, the Redland Plaintiffs failed to meet their *prima facie* burden under HSCA because they did not present sufficient evidence of exposure to the hazardous materials in the Park. The trial court also held that HSCA does not authorize attorney fees in a citizen suit.

On July 14, 1995, the Superior Court reversed the trial court and remanded the case for further proceedings. The Superior Court held that the Redland Plaintiffs had produced sufficient evidence of exposure to the hazardous materials in the Park to support a claim under HSCA. The Superior Court also held, contrary to the Third Circuit's Opinion, that a plaintiff seeking medical monitoring under HSCA is not required to show a need for special medical monitoring. Additionally, the court found that HSCA provides for attorney fees in a citizen suit.

■ We granted the Army's Petition for Allowance of Appeal,[2] limited to the issues of (1) whether private plaintiffs

2. The Army's Petition for Allowance of Appeal did not challenge the Superior Court's holding that the Redland Plaintiffs produced sufficient evidence of exposure to the hazardous materials in the Park to support

must show that they require special medical monitoring to recover medical monitoring damages as response costs under HSCA, and (2) whether HSCA authorizes attorney fees for medical monitoring claims.[3]

## DISCUSSION

■ When deciding a motion for summary judgment, a court must view the record in the light most favorable to the nonmoving party and must resolve all doubts concerning the existence of a genuine issue of material fact against the moving party. *Hayward v. Medical Center of Beaver County*, 530 Pa. 320, 608 A.2d 1040 (1992) (citing Pa.R.C.P. No. 1035).[4] Summary judgment is appropriate only in those cases where the right is clear and free from doubt. *Id.*

In 1988, the General Assembly enacted HSCA based, in part, on a finding that hazardous substances released into the

a *prima facie* claim for medical monitoring, and therefore, that issue is not before us.

3. In its Petition for Allowance of Appeal, the Army raised the claim that as a subdivision of the Federal Government, sovereign immunity protected it from suit under HSCA. Although sovereign immunity normally protects the Federal Government and its subdivisions from suit under state laws, there is an exception to sovereign immunity in CERCLA that provides, in relevant part, as follows:

> State laws concerning removal and remedial action, including State laws regarding enforcement, shall apply to removal and remedial action at facilities owned or operated by a department, agency, or instrumentality of the United States....

42 U.S.C. § 9620(a)(4). When the Army moved for summary judgment on the basis of sovereign immunity, the trial court held that there were genuine issues of material fact concerning the applicability of section 9620(a)(4) that prevented it from rendering a decision. The Army did not challenge the trial court's ruling before the Superior Court. The failure to raise the defense of sovereign immunity, however, does not result in the waiver of the defense because the defense may be raised at any time. *See, e.g., Tulewicz v. Southeastern Pa. Transp. Auth.*, 529 Pa. 588, 606 A.2d 427 (1992); *In re Upset Sale*, 522 Pa. 230, 560 A.2d 1388 (1989). Nonetheless, considering the trial court's holding that there were genuine issues of material fact regarding sovereign immunity, we did not grant allowance of appeal on this issue. Therefore, the question of sovereign immunity will have to wait for the trial court's disposition of this case on remand.

4. Pa.R.C.P. No. 1035 was rescinded effective July 1, 1996, and replaced by Pa.R.C.P. No. 1035.1 through 1035.5.

environment pose a substantial threat to the health and welfare of the residents of the Commonwealth. 35 P.S. § 6020.102(2). The General Assembly decided that traditional legal remedies were not adequate to prevent the release of hazardous substances into the environment. 35 P.S. § 6020.102(5). It found that "[e]xtraordinary enforcement remedies and procedures are necessary and appropriate to encourage responsible persons to clean up hazardous sites and to deter persons in possession of hazardous substances from careless or haphazard management." 35 P.S. § 6020.102(9). Therefore, it created HSCA, which is an "independent site cleanup program" designed to "promptly and comprehensively address the problem of hazardous substance releases in this Commonwealth, whether or not these sites qualify for cleanup under [CERCLA]." 35 P.S. 6020.102(8).

HSCA makes it unlawful to "[c]ause or allow a release of a hazardous substance."[5] 35 P.S. § 6020.1108(1). Private citizens injured or threatened with injury from the release of a hazardous substance may bring suit under the citizen suit provision of HSCA, which states:

§ 6020.1115. Citizen suits

(a) General rule.-A person who has experienced or is threatened with personal injury or property damage as a result of a release of a hazardous substance may file a civil action against any person to prevent or abate a violation of this act or of any order, regulation, standard or approval issued under this act.

(b) Jurisdiction.—The courts of common pleas shall have jurisdiction over any actions authorized under this section.... The court may grant any equitable relief; may impose a civil penalty under section 1104; and may award litigation costs, including reasonable attorney and witness fees, to the prevailing or substantially prevailing party whenever the court determines such an award is appropriate.

---

**5.** The term "release" includes dumping, disposing or discharging into the environment. 35 P.S. § 6020.103.

. . . .

35 P.S. § 6020.1115.

HSCA imposes liability for certain remedies related to the release of a hazardous substance as follows:

§ 6020.702. Scope of liability

(a) General Rule.—A person who is responsible for a release or threatened release of a hazardous substance from a site as specified in section 701 is strictly liable for the following response costs and damages which result from the release or threatened release or to which the release or threatened release significantly contributes:

(1) Costs of interim response which are reasonable in light of the information available to the department at the time the interim response action was taken.

(2) Reasonable and necessary or appropriate costs of remedial response incurred by the United States, the Commonwealth or a political subdivision.

(3) *Other reasonable and necessary or appropriate costs of response incurred by any other person.*

(4) Damages for injury to, destruction of or loss of natural resources within this Commonwealth or belonging to, managed by, controlled by or appertaining to the United States, the Commonwealth or a political subdivision. This paragraph includes the reasonable costs of assessing injury, destruction or loss resulting from such a release.

(5) *The cost of a health assessment or health effects study.*

35 P.S. § 6020.702(a) (emphasis added).

HSCA does not define the terms "health assessment" or "health effects study", but it does supply the following definition of "response":

"Response." Action taken in the event of a release or threatened release of a hazardous substance or a contaminant into the environment to study, assess, prevent, minimize or eliminate the release in order to protect the present

or future public health, safety or welfare or the environment. The term includes, but is not limited to:

. . . .

(2) Actions at or near the location of the release, such as studies; health assessments; . . . and monitoring and maintenance reasonably required to assure that these actions protect the public health, safety, and welfare and the environment.

. . . .

(5) Other actions necessary to assess, prevent, minimize or mitigate damage to the public health, safety or welfare or the environment which may otherwise result from a release or threatened release of hazardous substances or contaminants.

. . . .

35 P.S. § 6020.103.

Here, the Redland Plaintiffs filed their complaint pursuant to section 6020.1115 and section 6020.702. They requested equitable relief under section 6020.1115(b) in the form of a medical monitoring trust fund, which they claim is a cognizable response cost under section 6020.702(a). Although section 6020.702(a) does not explicitly use the words "medical monitoring trust fund", we believe that the terms "costs of response", "health assessment" and "health effects study" in section 6020.702(a) encompass such a remedy. Our interpretation of these terms is consistent with the General Assembly's clearly stated intent "to provide new remedies to protect the citizens of this Commonwealth against the release of hazardous substances. . . ." 35 P.S. § 6020.102(5).[6]

---

**6.** A claim for a medical monitoring trust fund is significantly different from a claim for a lump sum award of damages. A trust fund compensates the plaintiff for only the monitoring costs actually incurred. In contrast, a lump sum award of damages is exactly that, a monetary award that the plaintiff can spend as he or she sees fit. Various courts have advocated the trust fund approach instead of the lump sum approach. *Hansen v. Mountain Fuel Supply Co.,* 858 P.2d 970 (Utah 1993); *Ayers v. Township of Jackson,* 106 N.J. 557, 525 A.2d 287 (1987); *Burns v. Jaquays Mining Corp.,* 156 Ariz. 375, 752 P.2d 28

■ The next question, then, is what elements are necessary to establish a claim for a medical monitoring trust fund under HSCA. In the federal court action, the Third Circuit opined that the elements of a claim for medical monitoring under HSCA are the same as the elements of a common law claim for medical monitoring. *Redland*, 55 F.3d at 849 n. 12. We agree, and therefore, we turn to an examination of Pennsylvania common law to determine the elements of a claim for medical monitoring.

One of the earliest reported Pennsylvania cases to discuss a common law cause of action for medical monitoring in a toxic tort case is *Peterman v. Techalloy Co., Inc.*, 29 Pa. D. & C.3d 104 (Montgomery County 1982). In *Peterman*, the plaintiff sought a medical monitoring trust fund, alleging that his exposure to water contaminated with a hazardous substance increased his risk of serious illness or death. The court rejected the plaintiff's claim, holding that Pennsylvania law

(App.1987). The Supreme Court of New Jersey explained the advantages of the trust fund approach as follows:

> In our view, the use of a court-supervised fund to administer medical-surveillance payments in mass exposure cases ... is a highly appropriate exercise of the Court's equitable powers.... Such a mechanism offers significant advantages over a lump-sum verdict.... [A] fund would serve to limit the liability of defendants to the amount of expenses actually incurred. A lump-sum verdict attempts to estimate future expenses, but cannot predict the amounts that actually will be expended for medical purposes. Although conventional damage awards do not restrict plaintiffs in the use of money paid as compensatory damages, mass-exposure toxic-tort cases involve public interests not present in conventional tort litigation. The public health interest is served by a fund mechanism that encourages regular medical monitoring for victims of toxic exposure....
>
> Although there may be administrative and procedural questions in the establishment and operation of such a fund, we encourage its use by trial courts in managing mass-exposure cases.... [M]edical-surveillance damages will be paid only to compensate for medical examinations and tests actually administered, and will encourage plaintiffs to safeguard their health by not allowing them the option of spending the money for other purposes.

*Ayers*, 525 A.2d at 314 (footnote omitted). We, too, believe that a medical monitoring trust fund is a more appropriate remedy than lump sum damages in mass exposure toxic tort cases. However, because the Redland Plaintiffs are seeking only a medical monitoring trust fund, we offer no opinion concerning whether lump sum damages are recoverable under HSCA.

required an actual injury before permitting recovery. Because his claim was predicated on the possibility of a future injury, the court dismissed the claim.

Three years later, in *Habitants Against Landfill Toxicants v. City of York*, No. 84–S–3820 (Pa. York County May 20, 1985), 15 Envtl.L.Rep. 20937, 1985 WL 19991, the Court of Common Pleas of York County held that the plaintiffs, who alleged injury from the leakage of toxic substances at a landfill, could maintain a common law claim in equity for a medical monitoring trust fund. In reaching this holding, the court recognized the peculiar difficulties facing plaintiffs at risk for contracting a serious latent disease who are presently unable to demonstrate an actual physical injury. The court noted that "[i]f plaintiffs are deprived of any necessary diagnostic services in the future because they have no source of funds available to pay for the testing, the consequences may result in serious, if not fatal illness." *Habitants*, 15 Envtl. L.Rep. at 20938 (quoting *Ayers v. Township of Jackson*, 189 N.J.Super. 561, 461 A.2d 184, 190 (Law Div.1983)).

In 1990, the Third Circuit was confronted with a Pennsylvania common law claim for medical monitoring in *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829 (3d Cir.1990) (*Paoli I*). The court noted that the issue of medical monitoring had not yet reached the Pennsylvania Supreme Court or the Pennsylvania Superior Court. Nonetheless, after surveying decisions from the courts of common pleas, federal district courts in Pennsylvania, and courts from several other jurisdictions, the Third Circuit predicted that our Court would recognize a cause of action for medical monitoring. *See Wiley v. State Farm Fire and Casualty Co.*, 995 F.2d 457 (3d Cir.1993) (when state Supreme Court has not spoken on an issue, Court of Appeals sitting in diversity must predict how state court would resolve the issue).

In reaching this conclusion, the Third Circuit acknowledged that Pennsylvania courts traditionally have been reluctant to permit remedies in tort actions absent actual injury, particularly where the plaintiff sought damages for increased risk of future harm. However, the court persuasively explained why

a claim for medical monitoring was different from a claim for increased risk of future harm:

> [A]n action for medical monitoring seeks to recover only the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm, whereas an enhanced risk claim seeks compensation for the anticipated harm itself, proportionately reduced to reflect the chance that it will not occur. . . .
>
> . . . The injury in an enhanced risk claim is the anticipated harm itself. The injury in a medical monitoring claim is the cost of the medical care that will, one hopes, detect that injury. The former is inherently speculative because courts are forced to anticipate the probability of future injury. The latter is much less speculative because the issue for the jury is the less conjectural question of whether the plaintiff needs medical surveillance.

*Paoli I,* 916 F.2d at 850–51 (footnote omitted).

The Third Circuit then predicted that our Court would require a party to meet the following test to establish a claim for medical monitoring:

> 1. Plaintiff was significantly exposed to a proven hazardous substance through the negligent actions of the defendant.
>
> 2. As a proximate result of exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease.
>
> 3. That increased risk makes periodic diagnostic medical examinations reasonably necessary.
>
> 4. Monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.

*Paoli I,* 916 F.2d at 852.

Four years later, the Third Circuit refined this test in *In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717 (3d Cir. 1994) (*Paoli II* ). The court held that in addition to the elements of the *Paoli I* test, a plaintiff had to show that "a reasonable physician would prescribe for her or him a moni-

toring regime different than the one that would have been prescribed in the absence of that particular exposure." *Paoli II*, 35 F.3d at 788 (quoting *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 980 (Utah 1993)). The court explained that special medical monitoring was a necessary element of the claim "because under this cause of action, a plaintiff may recover only if the defendant's wrongful acts increased the plaintiff's incremental risk of incurring the harm produced by the toxic substance enough to warrant a change in the medical monitoring that otherwise would be prescribed for that plaintiff." *Id.* (quoting *Hansen*, 858 P.2d at 980).

The Third Circuit further explained the purpose of the special medical monitoring requirement in the *Redland* federal action as follows:

*Paoli II*'s requirement of "special" medical monitoring implicitly recognizes the longstanding requirement in all tort cases other than those based on the old "intentional" common law torts for various forms of trespass that a plaintiff must prove an injury before he may recover anything from a defendant. Otherwise, a polluter would become a health care insurer for medical procedures routinely needed to guard persons against some of the ordinary vicissitudes of life. It would convert toxic torts into a form of specialized health insurance. Imposition of liability on this basis seems to go beyond current tort theories of negligence or strict liability by requiring a polluter to pay for medical procedures that the general population should receive. Thus, *Paoli II* requires plaintiffs to show not only that their exposure to toxic substances is greater than normal background levels, but that the increased risk of injury from such exposure warrants medical monitoring against future illness beyond that which is recommended for everyone.

*Redland*, 55 F.3d at 846 n. 8 (citations omitted).

The issue of medical monitoring finally reached our Court in *Simmons v. Pacor, Inc.*, 543 Pa. 664, 674 A.2d 232 (1996), where, in a unanimous Opinion by Mr. Justice Zappala, we recognized medical monitoring as a viable cause of action under Pennsylvania law. In *Simmons*, the plaintiffs had

developed asymptomatic pleural thickening as a result of their occupational exposure to asbestos and sought damages for increased risk and fear of cancer. We held that damages for increased risk and fear of cancer were too speculative to be recoverable where cancer was not present. Because the plaintiffs in *Simmons* had not developed cancer, we did not permit them to recover for their increased risk and fear of cancer. We did, however, adopt a rule of law permitting plaintiffs with asbestos-related asymptomatic pleural thickening to recover for medical monitoring.

While *Simmons* concerned only medical monitoring necessitated by asbestos exposure, we find no reason to limit common law medical monitoring claims to asbestos-related injuries. It was the non-speculative nature of a claim for medical monitoring, not simply the characteristics of asbestos exposure, that prompted our recognition of a claim for medical monitoring. *Simmons*, 543 Pa. at 680 n. 11, 674 A.2d at 240 n. 11 (quoting *Paoli I*, 916 F.2d at 850–51). Moreover, as explained by the Supreme Court of Utah in *Hansen*, there are several important reasons to recognize claims for medical monitoring:

[M]edical surveillance damages promote early diagnosis and treatment of disease or illness resulting from exposure to toxic substances caused by a tortfeasor's negligence. *Ayers*, 525 A.2d at 311. Allowing recovery for such expenses avoids the potential injustice of forcing an economically disadvantaged person to pay for expensive diagnostic examinations necessitated by another's negligence. Indeed, in many cases a person will not be able to afford such tests, and refusing to allow medical monitoring damages would in effect deny him or her access to potentially life-saving treatment. It also affords toxic-tort victims, for whom other sorts of recovery may prove difficult, immediate compensation for medical monitoring needed as a result of exposure. Additionally, it furthers the deterrent function of the tort system by compelling those who expose others to toxic substances to minimize risks and costs of exposure. Allowing such recovery is also in harmony with "the important public health interest in fostering access to medical

testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease." *Ayers,* 525 A.2d at 311.

*Hansen,* 858 P.2d at 976–77 (citation omitted) (footnote omitted).[7]

Although we recognized a cause of action for medical monitoring in *Simmons,* the plaintiffs there did not seek relief on that ground. Thus, we did not have the opportunity to articulate the specific elements of a claim for medical monitoring in *Simmons.*

Against this background, the Superior Court in the present case addressed the elements of a common law medical monitoring claim. The Superior Court tacitly approved the *Paoli I* test, but explicitly declined to adopt the special medical monitoring requirement adopted by the Third Circuit in *Paoli II* and explained in *Redland.* Instead of supplying an analysis of the reasons for its rejection of the special medical monitoring requirement, the Superior Court simply stated that it was not bound to follow the Third Circuit's decisions predicting Pennsylvania law.

We believe, however, that *Paoli I, Paoli II* and the *Redland* federal action provide a persuasive approach to defining the elements of a cause of action for medical monitoring. Unfortunately, the nuances added to *Paoli I* in *Paoli II* and *Redland* make the verbatim adoption of the *Paoli I* test impractical. Therefore, we find it necessary to formulate our own standards. Accordingly, we hold that a plaintiff must prove the following elements to prevail on a common law claim for medical monitoring:

(1) exposure greater than normal background levels;

(2) to a proven hazardous substance;

(3) caused by the defendant's negligence;

7. We note that the plaintiffs in *Hansen* sought medical monitoring damages because of their exposure to asbestos, but, in recognizing a cause of action for medical monitoring, the Supreme Court of Utah made no attempt to limit the cause of action to asbestos-related claims.

(4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease;

(5) a monitoring procedure exists that makes the early detection of the disease possible;

(6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and

(7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.[8]

Proof of these elements will naturally require expert testimony.

As previously stated, the elements of a common law medical monitoring claim are also the elements of an HSCA medical monitoring claim under section 6020.702(a). Thus, we must next determine if the Redland Plaintiffs have produced sufficient evidence in support of their HSCA medical monitoring claim to withstand the Army's motion for summary judgment. The only element of the claim at issue in this appeal is whether the prescribed monitoring regime is different from that normally recommended in the absence of such exposure.

In support of their claim that they require special medical monitoring, the Redland Plaintiffs submitted the report of Dr. Susan M. Daum, M.D. In her report, Dr. Daum recommends various testing procedures for the individuals exposed to hazardous substances in the Park. Specifically, Dr. Daum states that "[c]ancer detection should be annual in any individual ≥ 15 years from the first exposure to environmental carcinogens and/or every 5 years in adults age 20–45 and annually thereafter (except as indicated in specific tests)." She then recommends the following tests for cancer: (1) a physical examination, including a rectal examination, with

---

8. We recognize that the Utah Supreme Court in *Hansen* required a plaintiff to prove that a treatment exists which makes the early detection of the disease beneficial. *Id.* at 979. However, contrary to *Hansen* and the Third Circuit's prediction in *Paoli I,* we do not require a plaintiff to show that a treatment currently exists for the disease that is the subject of medical monitoring. *Id.* at 852. To do so would unfairly prevent a plaintiff from taking advantage of advances in medical science.

testicular palpation for masses in boys and men; (2) an oral examination for detection of oral cancers or precancerous lesions; (3) a complete blood count; (4) twelve channel chemistries; (5) a hemoccult test on a high roughage diet, three times annually; (6) a flexible sigmoidoscopy every five years for adults more than forty-five years of age; (7) a urinalysis; and (8) an annual chest x-ray for individuals more than forty years of age. She characterizes these recommendations as follows:

I emphasize, as well, that the examinations suggested ... are not out of the ordinary, but consist of the usual adult medical examinations recommended for all adults with the adult risk of cancer in our society from those carcinogen exposures which are already prevalent. It is because of the increased risk of the exposures at the Marsh Run area, however, that such examinations become more urgent, and access to such examinations should not be left to vicissitudes of employment, health insurance contract, or other individual economic difficulties so prevalent in current health care delivery.

R. 562a.

The Army argues that these comments demonstrate that Dr. Daum's monitoring regime is not different from a regime normally recommended absent the exposure. In the federal action, the Third Circuit addressed this same question and agreed with the Army. We believe, however, that the Army and the Third Circuit have overemphasized the quoted passage without carefully considering the actual recommendations in Dr. Daum's report. Indeed, after reviewing Dr. Daum's report, Dr. Jessica Herzstein, M.D., M.P.H., an expert for the Army, stated the following in a report that the Army submitted in support of its motion for summary judgment:

The American Cancer Society (ACS) publishes "Recommendations for the Early Detection of Cancer in Asymptomatic People." In the latest guidelines (see attachment), screening exams are recommended for various types of cancer in populations starting at age 18, though most recommendations are for those over age 40 or 50 years of age. Dr.

Daum states that her screening tests "consist of the usual adult medical examinations recommended for all adults with the adult risk of cancer in our society." *However, in her "Recommended Surveillance Tests for Cancer," Dr. Daum has included additional testing which is not recommended by the ACS. For example, she has recommended a complete blood count, 12 channel chemistries, urinalysis, and a chest x-ray, none of which are part of the ACS guidelines.* R. 805a (emphasis added). Thus, *the Army's own expert* has acknowledged that Dr. Daum's monitoring regime differs from guidelines proposed for the general population.

 Viewing the record in the light most favorable to the Redland Plaintiffs as the nonmoving parties, we believe that although Dr. Daum's report is somewhat inconsistent, her recommended monitoring regime is sufficiently different from that normally recommended in the absence of exposure to support a *prima facie* claim for special medical monitoring and survive a motion for summary judgment. On remand, of course, the trier of fact is free to weigh the evidence presented by both parties and to decide if the Redland Plaintiffs have *proven* each element of their claim for medical monitoring.[9]

The second question presented by this appeal is whether HSCA permits the recovery of attorney fees for medical monitoring claims. Section 6020.1115(b) provides that a court in a private citizen suit "may award litigation costs, including reasonable attorney and witness fees, to the prevailing or substantially prevailing party whenever the court determines such an award is appropriate." 35 P.S. § 6020.1115(b). The Army, however, characterizes the Redland Plaintiffs' suit as an action brought pursuant to section 6020.702. It argues that since the Redland Plaintiffs are seeking a medical monitoring

---

9. If, on remand, the Redland Plaintiffs prevail on their claim for a medical monitoring trust fund, the trial court will need to establish and to administer such a fund. We agree with the New Jersey Supreme Court that this task is best handled on a case-by-case basis. *Ayers,* 106 N.J. at 610 n. 14, 525 A.2d 287. Generally, however, a trial court should appoint an administrator to oversee the trust fund and the defendant should bear the costs of administration. A trial court should also establish procedures for the submission, review and payment of claims for the costs of medical monitoring.

trust fund under section 6020.702, and that section does not specifically authorize attorney fees, then they cannot recover attorney fees. We disagree.

■ Section 6020.1115 is the only section of HSCA that authorizes citizen suits, and thus, it is the only section under which the Redland Plaintiffs could have brought suit. Section 6020.702 specifies various categories of relief for which a defendant may be liable under HSCA. A plaintiff cannot bring a citizen suit under section 6020.702. Instead, a plaintiff must bring a citizen suit under section 6020.1115 and may seek the relief available to private plaintiffs included in section 6020.702, which, as previously discussed, encompasses a medical monitoring trust fund. Although section 6020.702 is silent concerning attorney fees, section 6020.1115(b) explicitly empowers a court to award attorney fees to the prevailing or substantially prevailing party if the court determines that such an award is appropriate. Thus, a plaintiff filing a citizen suit under section 6020.1115, seeking equitable relief in the form of a medical monitoring trust fund under section 6020.702, can also seek attorney fees under section 6020.1115.

The Army further contends that because CERCLA does not authorize attorney fees for a private plaintiff seeking response costs, *Key Tronic Corp. v. United States,* 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), we should interpret HSCA to impose a similar limitation. We disagree. When the General Assembly enacted HSCA, it was fully aware of the existence of CERCLA, but decided that an "independent site cleanup program" was necessary to protect the public health and environment. 35 P.S. § 6020.102(8). The General Assembly also decided that "new remedies" were necessary to protect the citizens of this Commonwealth from the release of hazardous substances. 35 P.S. § 6020.102(5). Therefore, we are not persuaded that the unavailability of a remedy under CERCLA should control whether the same remedy is available under HSCA.[10]

10. The Army also contends that sovereign immunity precludes the award of attorney fees against it under HSCA. As discussed in footnote 3, the question of sovereign immunity will be resolved on remand.

Accordingly, the Order of the Superior Court is reversed concerning special medical monitoring and affirmed concerning attorney fees. We remand this case to the trial court for proceedings consistent with this Opinion.

ZAPPALA, J., concurs in the result.