**John DOMBROWSKI, et al., Plaintiffs,**

**v.**

**GOULD ELECTRONICS, INC., Defendant.**

**No. CIV.A. 3:CV–93–0120.**

United States District Court, M.D. Pennsylvania.

Nov. 20, 1998.

John B. Beemes, Clarks Summit, PA, Mark R. Cukes, Philadelphia, PA, for plaintiffs.

G. Wayne Rennersen, Mark A. Lockett, Philadelphia, PA, for defendant.

## MEMORANDUM AND ORDER

CONABOY, District Judge.

Among other things, the Plaintiffs, by this lawsuit, seek to require Defendant to establish a medical monitoring program for those exposed to lead emissions from the Defendant's site in Throop, Pennsylvania. We consider here Defendant's motion to preclude testimony regarding medical monitoring, and specifically, the use of "KXRF technology"[1] in such a program. (Doc. 176).

At issue then, by this motion, is whether we will allow Plaintiffs to present certain testimony to a jury so the jury, in turn, can decide what relief Plaintiffs may recover. *Id.*

We will deny Defendant's motion as it pertains to medical monitoring in general, and sustain Defendant's motion as it pertains to the use of KXRF technology.

### FACTUAL & PROCEDURAL BACKGROUND

From approximately 1962 to 1980, the Marjol Battery Company owned and operated a battery crushing and lead processing plant in the borough of Throop, Lackawanna County, Pennsylvania (hereinafter "The Site"). The Site was located within a residential neighborhood wherein the Plaintiffs resided. In 1980 Gould merged with Marjol, became the owner of the site, and continued operations on the site until 1982.[2]

As a result of the business activities at The Site, it became contaminated with lead and other hazardous materials. Specifically, the lead, by means of leakage, seepage, runoff, emission and/or erosion, contaminated the surrounding air and ground water, as well as the soil of the neighboring residences. In accordance with state and federal environmental departments and their policies, The Site has undergone and is still undergoing, cleanup measures in order to remedy the hazardous conditions in the area.

The Plaintiffs in this action are present or former residents of the Borough of Throop in the area near The Site, who initiated this complaint in the Court of Common Pleas of Lackawanna County for the Commonwealth of Pennsylvania, on the basis of strict liability, general common law claims and Pennsylvania Environmental Statutory Law. The case was removed to this Court pursuant to 28 U.S.C. § 1446. We retain diversity jurisdiction pursuant to 28 U.S.C. § 1332 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367. The complaint names a large number of Plaintiffs who claim to have present medical conditions as a result of being exposed to lead emissions from The Site. All of the Plaintiffs claim they have incurred an increased risk of harm in the form of susceptibility to contracting lead poisoning and other illnesses, thereby necessitating the need for medical monitoring damages.

Throughout the course of the proceedings in this case, the Plaintiffs have consistently stated that they intend to prove their legal entitlement to a medical monitoring program, essentially on the testimony of John F. Rosen, M.D., who was identified by the Plaintiffs as an expert in the field of toxic lead poisoning. Among other things, Dr. Rosen stated he intended to use a technology known as "KXRF bone lead testing" in the monitoring program on at least two groups: (a) women of child bearing age; and (b) adult males whose exposure histories are not otherwise "characterized in sufficient detail." (Doc. 193, p. 10).

---

**1.** The instrument involved uses x-ray sources to provoke and measure fluorescent lead signals from a targeted area, in an effort to measure bond lead content.

**2.** In 1994, Gould Incorporated, transferred all of its assets and liabilities to Gould Electronics, Inc., and was legally dissolved.

In response to the proposed testimony of Dr. Rosen, the. Defendant has filed two motions [3] seeking to have this court preclude the testimony of Dr. Rosen—particularly as it pertained to the KXRF technology—and generally, as it relates to medical monitoring. The Defendant argues, generally, that such testimony fails to meet the standards for expert testimony established in the Federal Rules of Evidence 702, 703, and 104, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *United States v. Downing*, 753 F.2d 1224 (3d Cir.1985), and fails to meet the test for medical monitoring set in *Redland Soccer Club v. Department of the Army*, 548 Pa. 178, 696 A.2d 137 (Pa. 1997).

In this posture, the Court set a date for what is called a "Daubert hearing." On August 24 through August 27, 1998, the Court heard testimony on these issues from John F. Rosen, M.D. and Paul Mushak, Ph.D. for the Plaintiffs, and Charles E. Becker, M.D., Raymond D. Harbison, Ph.D., and Ivor L. Preiss, Ph.D. on behalf of the Defendant.

At the conclusion of the hearing the Court identified a number of issues raised by the testimony and the parties thereafter filed briefs addressing each of these issues.

## LEGAL AUTHORITIES

### A

#### EXPERTS—SCIENTIFIC EVIDENCE

There are several Federal Rules of Evidence implicated in our consideration of this case.

*Rule 701. Testimony by Lay Witnesses*

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

*Rule 702. Testimony by Experts*

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

*Rule 104. Preliminary Questions*

(a) Questions of admissibility generally. Preliminary questions concerning the qualifications of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the Rules of Evidence except those with respect to privileges.

*Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion or Waste of Time.*

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Rule 702 of the Federal Rules of Evidence was generally acknowledged to be an effort to liberalize the standards for admitting expert opinion testimony. Nevertheless, there are instances in which the exclusion of expert testimony is appropriate because it will not be of assistance or it is not otherwise properly admissible. The most significant development in recent years concerning the admissibility of expert opinion and the case which both parties acknowledge should govern our reasoning here is *Daubert vs. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Daubert* held that the adoption of the Federal Rules of Evidence in 1975 (as quoted above), resulted in superseding the test for

---

**3.** Gould's first motion in limine (Doc. 158) sought the preclusion of testimony of John F. Rosen, M.D., regarding LXRF bone lead testing and bone lead studies. As a result of a stipulation between the parties dated August 18, 1998, testimony pertaining to LXRF bone lead testing as a part of the medical monitoring program was withdrawn from the case. Thus, the court proceeded on the alternate motion.

scientific evidence applied by many Courts following the decision in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). Under *Frye* the scientific principle or discovery underlying the expert's opinion "must have been sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.*

*Daubert* established a two-part approach when considering the admissibility of scientific evidence. First, the trial court must decide whether the expert testimony is based on the scientific method. Second, the court must determine if there is a fit between the expert testimony and disputed issues in the case. *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786.

The *Daubert* opinion also set out a flexible approach to the analysis of scientific evidence involving five non-exclusive factors.

(1)Whether the theory or technique can be tested.

(2)Whether the theory or technique has been subjected to peer review and publication.

(3)The known or potential error rate of the technique employed.

(4)The maintenance of standards controlling the technique's operation.

(5)Whether the theory or technique is "generally accepted" in the scientific community.

*Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786.

In applying this *Daubert* approach, the Court also must make a determination of whether the probative value of the testimony is substantially outweighed by the potential, Rule 403, dangers of unfair prejudice, confusion of the issues, or misleading the jury.

## B

### *MEDICAL MONITORING*

Recovery for medical monitoring is a relatively new legal concept. Traditionally, recovery for an injury was based on some sort of physical harm. But, the "injury" in a medical monitoring claim, is the cost of the medical care and examinations that hopefully will detect the onset of physical injury.

Historically, the United States Court of Appeals for the Third Circuit in *In Re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829 (3d Cir.1990) (*Paoli I*) and *In Re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717 (3d Cir.1994) (*Paoli II*), considered the medical monitoring concept claim and correctly predicted that the Pennsylvania Supreme Court would recognize a cause of action for medical monitoring. In *Paoli I* the Third Circuit developed what it predicted would be a four-part test to establish a claim for medical monitoring and added a 5th part in *Paoli II*. The Circuit Court described those tests as follows: (1) plaintiff was significantly exposed to a proven hazardous substance through the negligent actions of the Defendant; (2) as a proximate result of exposure, Plaintiff suffers a significantly increased risk of contracting a serious latent disease; (3) that increased risk makes periodic diagnostic medical examinations reasonably necessary; (4) monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial; (5) a reasonable physician would prescribe for her or him a monitoring regime different than the one that would have been prescribed in the absence of that particular exposure. *Paoli II*, 35 F.3d at 787–88.

In 1997, the Pennsylvania Supreme Court in *Redland Soccer Club v. Department of the Army*, 548 Pa. 178, 696 A.2d 137 (Pa.1997) [4] announced a test for proof of a medical monitoring claim that required proof of seven elements:

(1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring

---

4. The Defendant acknowledges that the Plaintiffs have met criteria 1, 2, 3, and 6, but argue that they fail to meet criteria 4, 5, and 7, as will be explained further herein.

regime is reasonably necessary according to contemporary scientific principles.

*Redland Soccer Club,* 696 A.2d at 145–46.

The Pennsylvania Supreme Court in *Redland* also cited four important policy reasons for recognizing such a cause of action:

First, medical monitoring promotes early diagnosis and treatment of disease resulting from exposure to toxic substances caused by a tortfeasor's negligence. Second, allowing recovery for such expenses avoids the potential injustice of forcing an economically disadvantaged person to pay for expensive diagnostic examinations necessitated by another's negligence, and affords toxictort victims, for whom other sorts of recovery may prove difficult, immediate compensation for medical monitoring needed as a result of the exposure. Third, medical monitoring furthers the deterrent function of the tort system by compelling those who expose others to toxic substances to minimize risks and costs of exposure; and Fourth, such recovery is in harmony with the important public health interest in fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease.

*Redland Soccer Club,* 696 A.2d at 145 (*citing Hansen v. Mountain Fuel Supply Co.,* 858 P.2d 970, 976–77 (Utah 1993)).

The Pennsylvania Hazardous Sites Cleanup Act (HSCA) imposes liability for certain remedies related to the release of hazardous substances into the environment and pertinent to this case § 6020.702(a) provides as follows:

"Response". Action taken in the event of a release or threatened release of a hazardous substance or a contaminant into the environment to study, assess, prevent, minimize or eliminate the release in order to protect the present or future public health, safety or welfare or the environment. The term includes, but is not limited to;

(2) actions at or near the location of the release, such as studies; health assessments; . . . and monitoring and maintenance reasonably required to assure that

these actions protect the public health, safety, and welfare and the environment.

(5) other actions necessary to assess, prevent, minimize or mitigate damage to the public health, safety or welfare or the environment which may otherwise result from a release or threatened release of hazardous substances or contaminants.

35 P.S. § 6020.103

Although § 6020.702(a) does not explicitly use the term "medical monitoring" the Supreme Court of Pennsylvania in *Redland,* found that the "terms 'cost of response' 'health assessment' and 'health effects study' in § 6020.702(a) encompass such a remedy." *Redland Soccer Club,* 696 A.2d at 142. The court in *Redland* also found that its interpretation of these terms is consistent with the General Assembly's clearly stated intent "to provide new remedies to protect the citizens of this Commonwealth against the release of hazardous substances . . . ." *Redland Soccer Club,* 696 A.2d at 142 (*citing* 35 P.S. § 6020.102(5)).

We have considered the evidence and testimony presented to the Court on this motion within the framework of the guidelines outlined in the foregoing legal authorities.

## POSITION OF PARTIES

In this motion to preclude, the Defendant argues that "Dr. Rosen should be precluded from testifying about his proposed medical monitoring program because KXRF technology is not a reliable or appropriate component of a medical monitoring plan for a lead exposed population, and further that Dr. Rosen's medical monitoring program is unreliable and contrary to contemporary scientific/medical principles within the medical community." (Doc. 192, p. 2). The Plaintiffs, on the other hand, argue that "Gould has failed to carry any part of the burden imposed upon it to exclude any aspect of Dr. Rosen's opinion and to the contrary, the credible evidence heard by this Court at the Rule 401 hearing served only to confirm the Plaintiffs' need for a medical monitoring program, and the medical and scientific appropriateness of Dr. Rosen's recommendations." (Doc. 193, p. 22–23).

Thus, the testimony, the law, and the positions of the parties pose several difficult dilemmas for the court—and the answers are of deep significance to the parties.

First, the witnesses mentioned are all acknowledged experts, with much experience in the toxic lead poisoning area—and have extensive and impressive credentials. They reach very different judgments however, on what should or should not be done for the Plaintiffs in this case, who lived or live in an area exposed to a significant hazard.

Second, lead is acknowledged to be very dangerous to human beings. It reposes essentially in the bone or skeletal structure of the body and certain events can cause it to latently move into the blood stream and cause significant difficulties. A universally recognized method of measuring lead levels is blood testing. But the Plaintiffs' experts say more needs to be done to determine the total level of lead in the body. There is significant dispute about what methods, if any, at this time, can properly measure total bone lead levels.

Third, a jury must, eventually, decide most of these questions. But it is the Court's duty to determine what testimony and evidence the jury can properly see and hear—since a jury cannot base its judgment on speculation or guesswork.

Fourth, expert testimony—and particularly expert testimony about new scientific devices and procedures—may be admitted, but only if it meets certain criteria—and only if it is more prone to enlighten rather than confuse or mislead a jury.

### DISCUSSION AND FINDINGS

We will discuss the legal issues, the positions of the parties, and our findings and conclusions in the context of the three *Redland* requirements which are contested and within the framework of the other legal standards outlined above.[5]

### A

*(4) Whether as a proximate result of the exposure, the Plaintiffs have a significant-ly increased risk of contracting a serious latent disease.*

■ Based on the testimony presented at the hearing, as well as the briefs submitted to the Court, we find substantial evidence exists that could lead a jury to find that as a proximate result of the lead exposure described herein, Plaintiffs have a significantly increased risk of contracting a serious latent disease. During the hearing there was testimony not only about the source of the contamination, but also on the substance of the lead itself and it dangerous capacities, including the fact that it is hazardous to human health if ingested in any quantity whatsoever. Indeed, considering the fact that the area in which they lived has been proven to contain high levels of lead, anyone within that location undoubtedly had a significantly increased risk of ingesting or being exposed to lead particles. Once ingested, lead can repose itself in the body in a way that makes its effects evident at a later date. For instance, there was significant testimony that lead which reposes itself in the bone structure of the body can, and often is released into the bloodstream as a result of a variety of "stresses" such as broken bones or pregnancy.

There is abundant testimony that describes in great detail the significant and extensive contamination caused by Defendant's conduct of the entire area. The Plaintiffs, over a long period of time, were exposed to that hazardous substance as they walked, lived, worked and played in their community and through the very air they breathed. There was also significant and extensive testimony concerning the dangers of lead in the human body and its potential for causing physical and neurological differences, sometimes, at dates long after the initial exposure or ingestion.

Accordingly, we find that as a result of the Plaintiffs' exposure to the hazardous substance, lead, created by the Defendant's conduct, there is substantial evidence that could lead a jury to find that there exists a significantly increased risk that the Plaintiffs will

---

5. *See* p. 8, n. 4.

contract or may contract a serious latent disease.

**(5) Whether a monitoring procedure exists that makes the early detection of the disease possible.**

 Upon a thorough review of the evidence and law involved, as well as the arguments of the parties, we have determined that there is sufficient admissible evidence which could lead a jury to determine that a monitoring procedure does in fact exist that would make the early detection of a disease possible. We are not convinced, however, that in applying the law as set forth in *Daubert*, as well as the Federal Rules of Evidence cited herein, Dr. Rosen's proposed testimony, as it pertains to KXRF testing, is admissible.

Although we acknowledge that the testimony shows that KXRF testing may detect evidence of lead in the bone structure, and may give readings to that effect, the testimony also reveals that there is no set standard against which to compare those trace readings in an effort to detect the possibility of disease or to determine the efficacy of those readings. This becomes a huge obstacle in the determination of the admissibility of such evidence because it makes it impossible to decide the significance of what the readings might happen to be. Dr. Rosen would propose to have a program whereby there would be a test made on a group from an area that was known not to have been exposed, and then to compare those readings to those of the exposed population. That proposal, however, begs the question that troubles the Court in that there is no set standard against which either of the readings could be compared. This problem is more easily understood when one realizes that the testimony shows that blood testing is indeed valuable because there are set standards that have been developed and accepted as levels from which one can indicate potential problems.

In addition, the evidence has shown that test results using the KXRF method can vary significantly depending on the nature of the instrument, the person using it, and how it was calibrated at the time of its use. Although there are several such instruments on the market, and some people taut one over the other, it is acknowledged that regardless of which machine is used, here Dr. Rosen would use the 1998 Chettle instrument, there is necessity to calibrate the instrument properly and use it in a certain manner to insure that it will perform to its best capacity. There was also extensive testimony about the inaccuracies of the instruments—i.e. negative readings—and the fact that no one, other than the Plaintiffs' witnesses, was satisfied that the instrument is an appropriate tool for anything other than research at this point in its development.

The Court was impressed with the argument that says essentially, if it is agreed, that lead essentially reposes in the bone structure of the body (as opposed to the bloodstream or blood plasma) why not allow for testing (monitoring) that measures lead in the bone. The basic problem with this argument is two-fold.

One, there is no agreed upon standard against which to test the readings, even if one were to agree that the proposed KXRF equipment was acknowledged to be capable of acceptable readings. Thus, the possibility of undue alarm and significant anxiety and misleading is great.

Secondly, while use of KXRF could be helpful from a research status, there is no provision for the requirement or allowance of a research program as compared to a program developed for clinical purposes.

Additionally, there was extensive testimony and evidence introduced showing that KXRF method has not gained wide acceptance in the scientific or medical community, except for experimental and research purposes. There was scant evidence that it is an appropriate or useful tool in the clinical sense, which, of course, is the purpose for which it is proposed in this case. The testimony revealed that there is rather extensive research going on in an effort to determine appropriate methods to measure bone lead levels and that the KXRF instrument is being used by some in conducting that research. There was also evidence that efforts to improve and perfect the KXRF instrument and methodology continue and hopefully will lead to an eventual method of accurate

measurement of bone lead levels which can be tested against an approved and accepted standard. There is no agreement, however, that this method or this instrument has as yet arrived at that stage.

We cannot find, therefore, that the KXRF methodology, including the instrument proposed to be used in this methodology, meets the standards of reliability, viability and general acceptance, as outlined in cases such as *Daubert* and other cases, and writings which guide a court in making this "gatekeepers" determination as to whether or not such evidence should be presented to a jury. We are convinced too that presentation of such evidence to a jury would violate the admissibility standard set in the Federal Rules of Evidence, particularly Rule 403, in that it would most likely create more confusion, would be misleading and would possibly lead to an inappropriate decision.

Blood lead testing, however, has been recommended and endorsed by both doctors and agencies as a reliable method in determining excessive lead exposure. The reliability of blood lead testing stems, at least in part, from the capability of comparing blood lead test results, at least for children, to the published standard of 10 ug/dl, set by the Center for Disease Control (CDC). Even though the CDC has not published a set standard for adults, there remains at least a guideline for comparison by way of the OSHA removal standard of 40 ug/dl. Blood lead testing is a more reliable method which can and does produce readings that can be tested against a standard. Testimony and evidence was also produced that indicated that it is also useful in signaling the need for further medical examinations which can help or lead to a more certain diagnosis. This is the very basic purpose of medical monitoring.

We are equally impressed with the defense argument that there is no need shown for monitoring because there are few, if any, Plaintiffs with present high blood lead levels. There was substantial evidence and testimony introduced, however, that counters this argument and establishes the fact that there is a need for continual review of blood lead levels. In addition, Plaintiffs produced abundant evidence and testimony that beyond immediate blood level testing, there is a need to be aware of and to review each person's past history, including exposure and potential exposure, as well as blood levels, and further, that additional review must be made of the individual's complaints and that there is a need, in some cases, for additional medical examinations, such as EKGs and neurological testing in certain cases. Simple reference to a blood lead level, much testimony showed, would not be an appropriate way to monitor people who have obviously been exposed to a substantial hazard.

In addition, these arguments go much more to the weight and credibility of the evidence, rather than its admissibility, and those matters are traditionally left to the determination of the jury.

All of this leads us to believe, therefore, that there is sufficient appropriate, admissible evidence, which could lead a jury to determine that there is a monitoring procedure which exists that makes early detection of the disease possible. We will rule inadmissible, however, the proposed testimony concerning the use of KXRF testing.

*(7) Whether the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.*

Although we find that a prescribed monitoring regime is reasonably necessary, we do not agree that the KXRF methodology has been shown to be reliable enough to be presented to a jury for possible consideration for inclusion in such a program. This lack of proof and reliability was demonstrated by the fact that no one testified in this case who corroborated Plaintiffs' expert witness' proposed use of KXRF methodology as a viable clinical tool, that is, in treating people or discovering disease. At best, the testimony and evidence could lead one to conclude that it is a valuable experimental tool and can be valuably used in research. In addition, we note, again, concerning the reliability of the instrument and methodology, that there are significant problems with potential errors in the use of this methodology that could mislead or misinform patients and the community about levels of bone lead that might lead to other medical problems. The very nature

of the Defendant's conduct that caused this problem, namely, the creation of a significant exposure of an entire community to a hazardous substance is such that there is serious concern that parties living in the area not be misinformed in a way that would improperly raise the level of anxiety about their own physical and psychological well being. It is perhaps in this area, where the concern would be the highest about the use of an experimental procedure, the results of which, according to the evidence in this case, can be very misleading and perhaps prone to cause more harm than good.

We acknowledge that more experimentation has been done in recent years with KXRF testing, but the results of those experiments have varied considerably. In spite of this increased experimentation however, there is scant evidence to corroborate the Plaintiffs' expert's assertion that beyond research, KXRF has a valuable clinical purpose. Therefore, although we find there is admissible evidence that medical monitoring is reasonably necessary, we find that the testimony to be presented to a jury should not include reference to KXRF technology.

### CONCLUSION

The proffered testimony concerning the admissibility of that portion of Plaintiffs' medical monitoring program that would be based on KXRF testing is precluded. However, we make the opposite ruling concerning a medical monitoring program that would include other means, such as blood testing, to continue examining and monitoring the Plaintiffs in this case.[6]

### ORDER

NOW, this 19th Day of November, 1998, it is hereby ORDERED that:

1. Gould's Motion in Limine to preclude the testimony of John F. Rosen, M.D. with respect to the proposed medical monitoring program (Doc. 176), is granted to the extent that Dr. Rosen's proffered testimony concerning the admissibility of that portion of

---

Plaintiff's medical monitoring program that would be based on KXRF testing is precluded. However, we have reached an opposite ruling concerning a medical monitoring program that would include other means, such as blood testing, chest x-rays, and EKGs to continue examining and monitoring the Plaintiffs in this case.

2. As a result of the stipulation between the parties dated August 18, 1998 (Doc. 180), Gould's motion for a continuance of trial for the first trial group and for an evidentiary hearing pertaining to LXRF bone lead testing (Doc. 149), is MOOT.

3. The Clerk of Court is directed to mark the docket sheet accordingly.

---

6. In Plaintiffs' proffer on medical monitoring they refer to the need for blood level testing, as well as a series of other tests, including chest x-rays and EKGs, when a patient's blood level, past history and complaints, etc. would indicate such need. While there was some argument against these procedures, we find they are without merit.