In re Pennsylvania Diet Drugs Litigation

C.P. of Philadelphia County, no. 9709-3162.

*Sol H. Weiss* and *Russell D. Henkin,* for plaintiffs. *Michael T. Scott* and *Alan Klein,* for defendants.

LEVIN, *J.,* March 12, 1999—Before this court are plaintiffs' motion for class certification, defendants' memorandum of law in opposition to plaintiffs' motion for class certification and all responses thereto. Plaintiffs seek certification of a medical monitoring claim on behalf of a class of "all persons in the Commonwealth of Pennsylvania who have used fenfluramine (sometimes referred to as 'Pondimin') and/or dexfenfluramine (sometimes referred to as 'Redux')." For the reasons stated below, we grant certification of plaintiffs' medical monitoring claim on behalf of all persons in the Commonwealth of Pennsylvania who have used fenfluramine and/or dexfenfluramine and who have not been diagnosed with primary or pulmonary hypertension or valvupathy.

## INTRODUCTION

Michael Ciocco, Christine Gazillo and Dennis McBride, plaintiffs, assert claims for medical monitoring on behalf of themselves and all Pennsylvania residents who have "used dexfenfluramine and/or fen-

fluramine." Defendants, Interneuron Pharmaceuticals[1] and American Home Products Corporation,[2] are pharmaceutical companies who manufactured, marketed, distributed or sold the popular diet drugs dexfenfluramine and fenfluramine.[3] Plaintiffs allege that defendants failed to exercise reasonable care in designing, manufacturing, selling, testing, advertising, promoting, and distributing fenfluramine and dexfenfluramine because they knew or should have known that these drugs individually or in combination with another anorectic drug, phentermine, created a high risk of unreasonable, dangerous side effects including but not limited to valvupathy,[4] pulmonary hypertension (PH) and primary pulmonary hypertension[5] (PPH) but failed to notify regulatory authorities, doctors, researchers or the public.

---

1. All state and federal actions against Interneuron have been stayed pursuant to Judge Bechtle's pretrial order no. 349 in the multidistrict litigation of In re Diet Drugs (phentermine, fenfluramine, dexfenfluramine) Products Liability Litigation. *Wish v. Interneuron Pharmaceuticals Inc.*, civil action, no. 98 C-CV-20594 (E.D. Pa. 1998).

2. There are three American Home Products Corporation defendants: Wyeth Laboratories Inc., Wyeth Laboratories Division of American Home Products Corporation, A.H. Robins Company Incorporated.

3. Dexfenfluramine and fenfluramine are anorectic drugs which increase satiety and suppress appetite. The combination use of these drugs with phentermine is popularly known as Fen-Phen or Dex-Fen-Phen. *1997 Physician Desk Reference.*

4. Valvupathy refers to a disease of the heart valves. The type of valvupathy associated with fenfluramine and/or dexfenfluramine consumption is a fibrous sheath covering the surface of the heart valves, which limits the valve's ability to pump blood. As a result, there is a backflow of blood which reduces blood flow to vital organs and causes congestion of blood in the heart and lungs. Pls.' exhibit B, Paul D. Stolley M.D. at ¶8.

5. Pulmonary hypertension is a disease which affects the heart and causes reduced cardiac output due to high blood pressure within

Plaintiffs claim that defendants knew of various studies linking dexfenfluramine and fenfluramine consumption to heart valve problems. As early as the 1970s, plaintiffs claim defendants had knowledge about European studies which showed an association between fenfluramine use and primary pulmonary hypertension but failed to notify the Food and Drug Administration. Plaintiffs additionally assert that defendants knew between 1994-1996 of 30 cases of heart-valve problems among diet pill users in Belgium. More recently, in March of 1997, plaintiffs claim that defendants met with doctors at the Mayo Clinic and learned about studies which found that 30 percent of 291 asymptomatic patients who took the diet drugs had damaged heart valves. Other studies conducted before the Food and Drug Administration's September 15, 1997 recommendation that dexfenfluramine and fenfluramine be withdrawn from the market also purportedly gave defendants knowledge about the risk of heart valve damage in persons who consumed dexfenfluramine and/or fenfluramine.[6] Despite their purported knowledge, defendants, plaintiffs

---

the lungs. Primary hypertension is specific to the lungs. Pls.' exhibit D, declaration of Gilbert E. D'Alonzo D.O. at ¶9. Clinical manifestations are shortness of breath, rapid breathing and chest pain. The disease may progress and lead to right heart valve failure with fluid accumulation in the body cavities and lead to death due to heart valve failure. Survival beyond three to four years after diagnosis is unusual. Pls.' exhibit B, declaration of Paul D. Stolley M.D. at ¶7.

6. In addition to the Mayo study, plaintiffs cite the results of the International Primary Pulmonary Hypertension Study which were released in the August 26, 1996 edition of the *New England Journal of Medicine*. The study concluded that persons who consumed fenfluramine-based anorexigens increased their risk of developing primary pulmonary hypertension by a multiple of more than 30. Pls.' consolidated compl. at 35.

claim, failed to adequately disclose the information to physicians, the public and regulatory authorities. In addition, plaintiffs maintain that defendants "knew of and encouraged (tacitly and otherwise) and profited from [the use of dexfenfluramine and fenfluramine with phentermine, despite knowing that such use] was not FDA recommended, was especially hazardous, was not recommended and had not been systematically tested by appropriate clinical trials." Pls.' consolidated compl. at ¶45.

As a result of defendants' alleged negligence, plaintiffs claim that they "and members of the class have been exposed to a hazardous and dangerous substance or substances which have caused them to be at a significantly increased risk of developing serious injury or disease." Pls.' consolidated compl. at ¶46. Due to their purported increased risk, plaintiffs allege they require periodic medical tests and examinations to detect and to prevent the development of these diseases and others which may be associated with dexfenfluramine and fenfluramine consumption. Plaintiffs request that defendants fund and that the court supervise a medical monitoring program which would provide medical tests and examinations for users of dexfenfluramine and/or fenfluramine.[7] In addition, plaintiffs' proposed medical monitoring program would:

"(1) locate persons who use or used fenfluramine and/or dexfenfluramine and notify them of the potential harm from such use;

"(2) fund the design and implementation of further studies of the long-term effects on fenfluramine and/or

---

7. The tests and examinations would include a medical history, physical examination, chest x-ray, electrocardiogram and echocardiogram. Pls.' exhibit C, declaration of Ira Gelb ¶11.

dexfenfluramine users, including population-based studies of and for the benefit of the class, including the establishment of an adverse health effects registry;

"(3) fund research into possible cures for the detrimental effects of fenfluramine and/or dexfenfluramine use;

"(4) gather and forward to treating physicians information relating to the diagnosis and treatment of injuries which may result from using fenfluramine and/or dexfenfluramine, individually or in combination with phentermine." Pls.' amd. consolidated compl. at ¶69.

Defendants deny all substantive allegations of plaintiffs' complaint and argue that plaintiffs have not satisfied the requirements for class certification set forth in Pennsylvania Rules of Civil Procedure. Thus, defendants contend the litigation of these issues should have to proceed, if at all, on an individual basis.

The pleadings in this matter are closed. The court held argument on the merits of plaintiffs' motion for class certification on October 1, 1999. Accordingly, this court makes the following findings of fact.

## II. FINDINGS OF FACT

(1) Michael Ciocco is a resident of the Commonwealth of Pennsylvania who, pursuant to a prescription, purchased and consumed fenfluramine and phentermine in combination and dexfenfluramine individually.

(2) Christine Gazillo is a resident of the Commonwealth of Pennsylvania who purchased and consumed fenfluramine in conjunction with phentermine, which was prescribed to her for combination use.

(3) Dennis McBride is a citizen of the Commonwealth of Pennsylvania who purchased and consumed dexfenfluramine pursuant to a prescription.

(4) Wyeth Laboratories Inc. (WLI) is a subsidiary of American Home Products Corporation (AHP), has its principal place of business in Wayne, Pennsylvania and is incorporated in Delaware. WLI distributed dexfenfluramine in Pennsylvania.

(5) Wyeth Ayerst Laboratories Division of American Home Products Corporation (WALD) is an unincorporated division of American Home Products Corporation, has its principal place of business in Wayne, Pennsylvania and is incorporated in Delaware. WALD marketed, promoted and sold both fenfluramine and dexfenfluramine and distributed them in Pennsylvania.

(6) A.H. Robins Company is a subsidiary of American Home Products, has its principal place of business in Richmond, Virginia and is incorporated in Delaware. Robins manufactured and marketed fenfluramine, which was sold in Pennsylvania.

(7) Interneuron Pharmaceuticals Incorporated has its principal place of business in Lexington, Massachusetts and is incorporated in Delaware. Interneuron promoted dexfenfluramine as "Redux" to health care providers located in Pennsylvania.

(8) Fenfluramine was approved by the FDA in 1973, is designed to inhibit appetite, and is recommended for "the management of exogenous obesity as a short-term (a few weeks) adjunct in a regimen of weight reduction based on caloric restriction." *1996 Physicians' Desk Reference (PDR).*

(9) Dexfenfluramine was approved by the FDA in 1996, and is designed to decrease caloric intake by increasing serotonin levels in the brain synapses. *1997*

*PDR*. The *1997 PDR* stated that dexfenfluramine "is indicated for the management of obesity including weight loss and maintenance of weight loss in patients on a reduced calorie diet" and that its safety and effectiveness beyond one year had not been determined.

(10) The *1997 PDR* stated that use of dexfenfluramine with other weight-loss agents is not recommended.

(11) The FDA approved phentermine in 1959.

(12) The Food and Drug Administration has not approved the use of phentermine with dexfenfluramine or fenfluramine.

(13) The 1983 package insert for Pondimin (fenfluramine) reported that two cases of pulmonary hypertension had been found in female patients who took fenfluramine for eight months. The label advised physicians that fenfluramine be used "with caution in hypertension, with monitoring of blood pressure since evidence is insufficient to rule out a possible adverse side effect on blood pressure in some hypertensive patients." AHP's exhibit 13.

(14) On June 20, 1996, AHP revised its package insert for Pondimin by reporting that a two-year international study found that 20 patients out of 95, who had been diagnosed with primary pulmonary hypertension, had consumed fenfluramine and other anorexigens. The insert also reported that the study found that there was an increased risk of PPH in persons who took the anorexigens for longer than three months. The insert explained that "in the majority of these cases, symptoms of pulmonary hypertension occurred in current users of fenfluramine or in patients who had used it within the past 12 months." The insert advised physicians "that treatment should be discontinued in patients who develop new unexplained symptoms of dyspnea, angina pectoris, syncope or lower extremity edema.

These patients should be evaluated for the etiology of these symptoms and the possible prevalence of pulmonary hypertension." AHP's exhibit 14.

(15) The 1996 physician package insert for Redux (dexfenfluramine) reported the same study and made the same warnings that were included in the package insert for Pondimin. AHP's exhibit 15.

(16) On September 15, 1997, the FDA announced that it had asked defendants to voluntarily withdraw both fenfluramine and dexfenfluramine from the market.

(17) The FDA requested the drugs' withdrawal after learning from doctors, who evaluated patients taking these two drugs, that approximately 30 percent of 291 asymptomatic patients had abnormal echocardiograms. FDA release, September 15, 1997 at 1; pls.' exhibit H.

(18) The FDA did not request that phentermine be withdrawn because it had not received any reports that persons who only used phentermine had heart disease which met the FDA case definition. *Id.*

(19) On November 14, 1997, the United States Department of Health and Human Services together with the Centers for Disease Control, National Institutes of Health and the FDA issued a joint recommendation that recommended:

"(1) a medical history and cardiovascular examination be performed to determine the absence or presence of cardiopulmonary signs on all persons exposed to fenfluramine or dexfenfluramine, for any period of time either alone or in combination with other agents.

"(2) an echocardiograhpic evaluation be performed on all persons who were exposed to dexfenfluramine or fenfluramine for any period of time, either alone

or in combination with other agents who exhibit cardiopulmonary signs.

"(3) physicians strongly consider performing echocardiography on all persons—regardless of whether they have cardiopulmonary signs or symptoms—who have been exposed to fenfluramine and/or dexfenfluramine for any period of time, either alone or in combination with other agents, before the patient undergoes any invasive medical or dental procedure." Pls.' exhibit N, *Morbidity and Mortality Weekly Report,* vol. 46 no. 45, November 14, 1997.

(20) In a letter dated January 21, 1998, Wyeth-Ayerst Laboratories' researchers warned persons who had participated in its dexfenfluramine study that "it is vital to your safety that you have an echocardiogram . . . ." Pls.' exhibit 9, dep. of Lorna Charles it 63-65.

(21) On December 23, 1997, plaintiffs filed a consolidated amended complaint, asserting the following counts: (1) negligence—medical monitoring; and (2) violation of Pennsylvania's Unfair Trade Practices Law, 73 P.S. §201-1 et seq.

(22) Defendants filed an answer in which they denied plaintiffs' allegations and asserted various defenses.

(23) The court dismissed plaintiffs' Count II on preliminary objections.

(24) Plaintiffs have filed this class action on behalf of the following proposed class:

"All persons in the Commonwealth of Pennsylvania who have used fenfluramine (sometimes referred to as 'Pondimin') and/or dexfenfluramine (sometimes referred to as 'Redux')."

## III. CERTIFICATION

Before we begin our analysis of the prerequisites to class certification, we will outline the elements of and policies behind a medical monitoring claim.

The Pennsylvania Supreme Court in *Redland Soccer v. Department of Army*, 548 Pa. 128, 696 A.2d 137 (1997) articulated the specific elements of a claim for medical monitoring.[8] Those elements are:

"(1) exposure greater than normal background levels;

"(2) to a proven hazardous substance;

"(3) caused by the defendant's negligence;

"(4) as a proximate result of the exposure, plaintiff his a significantly increased risk of contracting a serious latent disease;

"(5) a monitoring procedure exists that makes the early detection of the disease possible;

"(6) the prescribed monitoring regime is different from that normally recommended in the absence of exposure; and

"(7) the prescribed monitoring regimen is reasonably necessary according to contemporary scientific principles." *Redland* at 548 Pa. at 195-96, 696 A.2d at 145-46. (footnote omitted)

Expert testimony is required to prove each of these elements. *Id.* at 196, 696 A.2d at 146.

---

8. In *Redland,* plaintiffs, a soccer club, brought an action against the United States Army and Department of Defense under the Hazardous Sites Cleanup Act alleging that defendants' disposal of hazardous materials exposed them to hazardous substance and caused them harm by increasing their risk of getting cancer. *Id.* at 182-84, 696 A.2d at 139-41.

The court observed that there were several important reasons to recognize claims for medical monitoring. Medical monitoring:

"[1] promotes early diagnosis and treatment of disease or illness resulting from exposure to toxic substances caused by a tort-feasor's negligence;

"[2] avoids the potential injustice of forcing an economically disadvantaged person to pay for expensive diagnostic examinations necessitated by another's negligence [and prevents denying him or her potentially lifesaving treatment];

"[3] affords toxic-tort victims, for whom other sorts of recovery may prove difficult, immediate compensation for medical monitoring needed as a result of exposure;

"[4] furthers the deterrent function of the tort system by compelling those who expose others to toxic substances to minimize risks and costs of exposure; and

"[5] furthers the important public health interest in fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease." *Redland* at 194, 696 A.2d at 145 (quoting *Hansen v. Mountain Fuel Supply Co.,* 858 P.2d 970, 976-77 (Utah 1993)). (internal citations omitted)

The injury from which a medical monitoring claimant seeks recovery is the "quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm . . . ." *Id.* at 194, 696 A.2d at 144 (quoting *In re Paoli Railroad Yard PCB Litigation,* 916 F.2d 829 (3d Cir. 1990) (Paoli I)). Courts prefer that plaintiffs recover these costs through a court supervised and administered trust fund instead of through a lump sum damage award. *Redland* at 189 n.6, 696 A.2d at 142-43 n.6 (citing *Ayers v. Township of Jackson,* 106 N.J. 557,

525 A.2d 287, 314 (1987)). The reasoning behind this preference is that a trust fund compensates the plaintiff only for the monitoring costs actually incurred, thereby limiting defendants' liability to plaintiffs' incurred expenses. *Redland* at 189 n.6, 696 A.2d at 142-43 n.6 (citing *Ayers,* 525 A.2d at 314). An additional reason why "a medical monitoring trust is a more appropriate remedy than lump sum damages in mass exposure toxic tort cases" is that a trust fund serves the public interest by encouraging medical monitoring for victims of toxic tort exposure. See *id.,* n.6 (quoting *Ayers v. Township of Jackson,* 106 N.J. 557, 525 A.2d 287, 314). See also, *Butler v. Owens Corning,* Phila. C.C.P. no. 9608-2721 October 15, 1998 (Levin, J.) (dismissing under preliminary objections plaintiffs' request for lump sum damages and finding that lump sum damages are "contrary to the reasons and policies the [*Redland* court] gave for recognizing a medical monitoring class action . . . .").

With this background, we now turn to our present responsibility to determine whether plaintiffs' suit is properly certifiable as a class action. In this respect, our authority is limited by the Pennsylvania Rules of Civil Procedure: "[t]he hearing is confined to a consideration of the class action allegations and is not concerned with the merits of the controversy or with attacks on the other averments of the complaint. Its only purpose is to decide whether the action shall continue as a class action or as an action with individual parties only." Pa.R.C.P. 1707 (Explanatory note—1977).

Thus, for the time being, we must refrain from ruling on plaintiffs' ultimate right to recovery and on the merits of any defenses raised.[9]

---

9. Specifically, we note that the defense of failure to state a claim upon which relief can be granted is *not* waived if preserved until after certification. See Pa.R.C.P. 1705 (Explanatory note—1977).

Our decision at this stage is limited to whether plaintiffs[10] have satisfied the requirements described in Pennsylvania Rule of Civil Procedure 1702:

*"Rule 1702: Prerequisites to a class action*

"One or more members of a class may sue or be sued as representative parties on behalf of all members in a class action only if

"(1) the class is so numerous that joinder of all members is impracticable;

"(2) there are questions of law or fact common to the class;

"(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

"(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708."

In determining if these criteria are satisfied, the court is clearly vested with broad discretion. *Cambanis v. Nationwide Insurance Co.,* 348 Pa. Super. 41, 51, 501 A.2d 635, 640 (1985) (court has authority to certify certain claims, issues or forms of relief and not others); *Janicik v. Prudential Insurance Co.,* 305 Pa. Super. 120, 135, 451 A.2d 451, 457 (1982) (same). See Pa.R.C.P. 1710(c)(1); *Klemow v. Time Inc.,* 466 Pa. 189, 197, 352 A.2d 12, 16 (1975); *Prime Meats Inc.*

---

10. The burden of proving that class certification is appropriate clearly falls upon the party seeking certification. *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa. Super. 441, 449, 500 A.2d 1137, 1141 (1985); *Janicik v. Prudential Insurance Company of America,* 305 Pa. Super. 120, 131, 451 A.2d 451, 454 (1982).

*v. Yochim,* 422 Pa. Super. 460, 468, 619 A.2d 769, 773 (1993).

However, we recognize that decisions in favor of maintaining a class action should be liberally made. *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa. Super. 441, 448, 500 A.2d 1137, 1141 (1985); *Bell v. Beneficial Consumer Discount Co.,* 241 Pa. Super. 192, 205, 360 A.2d 681, 688 (1976) (class suits enable the assertion of many meritorious claims that might not otherwise be litigated). Accord, *Janicik,* 305 Pa. Super. at 128, 451 A.2d at 454.

Given this context, the court will enumerate the factors it considered in ruling on class certification.

### 1. *Numerosity*

To satisfy this criterion, the class must be both numerous and identifiable. A class is sufficiently numerous when "the number of potential individual plaintiffs would pose a grave imposition on the resources of the court and an unnecessary drain on the energies and resources of the litigants should such potential plaintiffs sue individually." *Temple University v. Pennsylvania Department of Public Welfare,* 30 Pa. Commw. 595, 603, 374 A.2d 991, 996 (1977) (123 plaintiffs sufficiently numerous); *ABC Sewer Cleaning Co. v. Bell of Pennsylvania,* 293 Pa. Super. 219, 225, 438 A.2d 616, 619 (1981) (250 plaintiffs sufficiently numerous); *Ablin Inc. v. Bell Telephone Co.,* 291 Pa. Super. 40, 51, 435 A.2d 208, 214 (1981) (204 plaintiffs sufficiently numerous). Where a class is narrowly and precisely drawn, but there are still so many potential members that joinder is impractical or impossible, the class is sufficiently delineated to satisfy the numerosity requirement. *Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 408, 615 A.2d 428, 430 (1992), citing *Cribb*

*v. United Health Clubs,* 336 Pa. Super. 479, 481, 485 A.2d 1182, 1184 (1984). A class is not sufficiently identifiable "where the class definition is so poorly established that the court [is unable to] discern who the potential class members are. . . ." *Weismer,* 419 Pa. Super. at 408, 615 A.2d at 430; *Dickler v. Shearson Lehman Hutton Inc.,* Phila. C.C.P. no. 9002-2653, opinion, April 17, 1997 (Levin, J.) (proposed class not identifiable because plaintiffs' inconsistent pleadings prevented court from identifying the class of potential plaintiffs).

Plaintiffs argue that their proposed class establishes numerosity because the class is sufficiently numerous and identifiable. Plaintiffs assert that the class is at least in the tens of thousands because tens of thousands of prescriptions for dexfenfluramine and fenfluramine were written in Pennsylvania. Plaintiffs claim that the class members are identifiable because medical and prescription records will establish whether—and to what extent—class members took the diet drugs.

Defendants respond that numerosity is not satisfied because the putative class is too broadly defined to identify the members of the class. Defendants argue that the definition of the class should include the requirement that plaintiffs consumed the diet drugs because of defendants' negligence. Defendants cite this court's opinion in *Weinberg v. Sun,* no. 9602-0094, opinion, April 6, 1998, for the proposition that a class is poorly defined unless it contains an essential element of the claim plaintiff seeks to certify. Because plaintiffs' proposed class definition does not include an essential element of the claim plaintiff seeks to certify, (*i.e.* plaintiffs' exposure to the hazardous substance was caused

by defendants' negligence), the class is poorly defined, and thus does not satisfy the numerosity requirement. Defendants argue that plaintiffs' medical monitoring claim is premised on defendants' alleged material omissions or material misrepresentations about the risks and dangers of dexfenfluramine and fenfluramine consumption. Thus, defendants assert that a proper definition of the class should include only those members who consumed the diet drugs based on what defendants represented to plaintiffs or plaintiffs' doctors. Because there is purportedly no evidence about the number of class members or their physicians who relied on the alleged misrepresentations, the court cannot identify the class, and, therefore, the class is neither sufficiently numerous nor identifiable.

Numerosity is satisfied because the class is sufficiently numerous and defined. Unlike the plaintiffs in *Weinberg,* the class definition identifies those members who have been injured by defendants' negligence. First, *Weinberg* does not stand for the broad proposition that a class is poorly defined unless it contains an essential of the claim putative class members seek to certify. As we explained in *Weinberg:*

"It bears stating that, in most class actions alleging fraud based claims, certification will typically turn on issues of typicality and commonality. This case is an exception, because the testimony focused on whether plaintiffs could identify anyone who had actually been injured by defendants' alleged improper conduct. Our conclusion . . . is that identifying the injured parties would be impossible without an individual inquiry that would make certification improper." *Weinberg v. Sun Company Inc.,* no. 9602-0084, Phila. C.C.P. (June 15, 1998).

Thus, we were careful in *Weinberg* to limit our decision to the unique facts the case presented.[11] The unique facts of *Weinberg* are not present here.

Second, even if *Weinberg* stood for defendants' broad proposition, plaintiffs' class definition is sufficient because it identifies persons who may have been injured by defendants' conduct. According to the plaintiffs, anyone who has consumed dexfenfluramine and/or fenfluramine needs medical monitoring as a result of defendants' negligence. In this case, plaintiffs' core theory of defendants' negligence is that the FDA would not have approved dexfenfluramine and fenfluramine had defendants disclosed what they knew about the diet drugs' dangerous side effects. No one would have consumed the drugs because the drugs would have never been on the market. Therefore, anyone who has consumed dexfenfluramine or fenfluramine is injured as a result of defendants' negligence. Additionally, the numerosity requirement is satisfied because AHP acknowledges that "numerous" prescriptions for fenfluramine and dexfenfluramine were written, and plaintiffs have asserted that approximately 10,000 prescriptions were written in Pennsylvania. Medical and prescription records will identify the plaintiff class. Therefore, we are satisfied that the class is sufficiently numerous and identifiable to satisfy the numerosity prong of Pa.R.C.P. 1702(a).

---

11. In *Weinberg*, plaintiffs alleged that defendant, Sun Company, committed fraud because they promoted their ultra-grade gasoline for use in all cars, knowing that only a limited amount of vehicles would benefit from such gasoline. Because plaintiff could identify only a limited amount of people who actually purchased the gasoline as a result of defendants' promotion, we held that numerosity was not satisfied. *Id.* at 13.

## 2. *Commonality*

For class certification, plaintiffs must also establish that their claim presents "questions of law or fact common to the class." Pa.R.C.P. 1702(2). "The common question of fact means precisely that the facts must be substantially the same so that proof as to one claimant would be proof as to all." *Allegheny County Housing Authority v. Berry*, 338 Pa. Super. 338, 342, 487 A.2d 995, 997 (1985); *Cook v. Highland Water and Sewer Authority*, 108 Pa. Commw. 222, 231-32, 530 A.2d 499, 504 (1987).

While the existence of individual questions essential to a class member's recovery is not necessarily fatal to the class, there must be a "predominance of common issues shared by all the class members which can be justly resolved in a single proceeding." *Weismer*, 419 Pa. Super. at 408-409, 615 A.2d at 431; *D'Amelio*, 347 Pa. Super. at 452, 500 A.2d at 1142 and *Janicik*, 305 Pa. Super. at 133, 451 A.2d at 457. See Pa.R.C.P. 1708(a)(1).

Plaintiffs argue that they have satisfied the commonality criterion because their claims involve the same legal theories and the elements of their medical monitoring claim are subject to common proof. Plaintiffs assert that *Redland's* first requirement—that plaintiffs be subject to greater than normal background levels—can be proven class-wide because there is no background level for fenfluramine or dexfenfluramine exposure. Thus, anyone who consumed dexfenfluramine and fenfluramine has been exposed to greater than normal background levels. Proving *Redland's* second element—whether dexfenfluramine and fenfluramine are hazardous substances—plaintiffs predict, will involve expert testimony which is common for every member of the

class. Plaintiffs argue that the same scientific research and data will be presented—whether in an individual suit or class suit—to determine whether the diet drugs are hazardous substances. Similarly, plaintiffs argue that the proof required to satisfy Redland's third requirement, that defendants' negligence caused plaintiffs' exposure, would be the same for every class member because "[w]hat each defendant should have known, and when the defendant should have known it, will be determined by what information was available at various points in time on a class-wide basis," and defendants' knowledge does not vary from plaintiff to plaintiff. Pls.' reply at 36. Similar to their argument about proving whether the diet drugs are hazardous, plaintiffs argue that *Redland's* fourth element—whether plaintiffs are at a significant increased risk of contracting a serious latent disease—is a common issue which will be resolved by common expert testimony. Plaintiffs argue that their experts will group individual class members according to common characteristics and testify that the group and each of its members are at increased risk of developing valvupathy, PH and PPH as a result of dexfenfluramine and fenfluramine consumption.

Plaintiffs also contend that the remaining *Redland* requirements regarding the monitoring regimen are subject to common proof. The question of whether a monitoring procedure exists that makes the early detection of the disease possible is common to all class members because "health agencies, medical associations and plaintiffs' and defendants' experts have identified, at a minimum, a physical examination by a doctor, and plaintiffs' experts have recommended echocardiograms to detect valvupathy." Pls.' reply mem. at 32. These recommendations, plaintiffs argue, raise the common question of whether a physical examination is a suf-

ficient monitoring procedure. Plaintiffs contend that the next element related to the monitoring regimen—whether the prescribed monitoring protocol is different from that normally recommended in the absence of exposure—is also capable of class resolution because plaintiffs' monitoring regimen must be compared with what is normally recommended for the general population. The monitoring program prescribed for the general population would apply to all class members. Plaintiffs characterize as a "claims administration issue" the question of whether the eventual monitoring program differs from what any particular class member is already receiving. This question, plaintiffs argue, "does not affect whether defendants are liable to the class." Pls.' reply at 33. According to plaintiffs' characterization, questions about the type and amount of medical monitoring each class member will receive is related to each member's damages, which generally does not preclude certification. Lastly, plaintiffs argue that *Redland's* final element—whether a monitoring regimen is reasonably necessary according to scientific principles—presents a common question because plaintiffs' experts will recommend a monitoring regimen according to the risk attributed to each group. In sum, plaintiffs argue that each element of their medical monitoring claim is capable of common proof, and thus common issues predominate over individual issues.

Defendants, by contrast, argue that nearly all the elements of plaintiffs' medical monitoring claim present individual issues which are incapable of class resolution. Determining whether plaintiffs have been exposed to a hazardous substance depends on the identity, duration, and combination of the drugs each plaintiff took, defendants argue. Similarly, defendants contend that proving that plaintiffs' exposure was caused by defendants'

negligence, presents individualized issues because each drug had different warnings at different times. Defendants argue that proving defendants' negligence "will be a function of what drug plaintiff used, when he used it, what the product labeling said at that time, and what each of the different defendants knew or should have known about different risks at different times." AHP's opp'n mem. at 49. Further complicating the causation inquiry, defendants argue, is the "learned intermediary doctrine." According to defendants, this doctrine requires plaintiffs to prove that a specific physician would not have prescribed the drug had a different warning been presented. Thus, the individual variations in what each class member's physician knew about the risks of the diet drugs "overwhelm any 'common' issues." *Id.* at 52. Likewise, defendants contend, variations in each plaintiff's medical condition prevent class-wide resolution of whether plaintiffs are at an increased risk of developing valvupathy, PH or PPH due to their diet drug consumption.

Defendants argue also that the elements relating to the medical monitoring regimen are incapable of class-wide resolution. Defendants argue that to determine whether the monitoring regimen is different from what is normally recommended in the absence of exposure, the court must compare each plaintiff's pre-exposure monitoring program with the recommended medical monitoring program. Such comparisons, they argue, involve individual inquiries, precluding class certification on that issue. Similarly, individual questions about patients' medical history, differences in each plaintiff's dosage and duration of diet drugs preclude class-wide determination of whether plaintiffs reasonably require a particular medical monitoring program. Finally, defendants argue that plaintiffs' proposal to have a claims

administrator is "unfair" and "unconstitutional" because the administrator would decide "disputed case dispositive issues" which should be decided by a jury after a trial. AHP's surreply at 5.

The court concludes that common questions of law and fact predominate over individual issues because plaintiffs' claims arise out of similar conduct by the defendants, and the elements of plaintiffs' medical monitoring claim are common to each class member. "Common questions will generally exist if the class members' legal grievances arise out of the 'same practice or course of conduct' on the part of the class opponent." *Janicik,* 305 Pa. Super. at 133, 451 A.2d at 457. (citations omitted) Common questions do not exist where "the challenged conduct affects the potential class members in such divergent ways, aggrieving some, benefiting others, that their interests become antagonistic to each other . . . ." *Id.* at 133 n.5, 451 A.2d at 457 n.5. Here, defendants' alleged failure to disclose the adverse side effects of dexfenfluramine and fenfluramine is common to all class members. The court is confident that further discovery will reveal what defendants knew about the diet drugs' adverse side effects and when they knew it.[12] This information may later preclude recovery for some class members because defendants may prove that they adequately disclosed information about the diet drugs' side effects, and thus their conduct could not have caused the plaintiffs' exposure to the diet drugs.[13] However, the likelihood that some class mem-

---

12. This analysis also applies to our conclusion that *Redland's* third element, whether defendants' negligence caused plaintiffs' exposure, can be determined class-wide.

13. Of course, if plaintiffs prove that the FDA would have never approved of dexfenfluramine or fenfluramine had defendants revealed information that they knew or should have known, then defendants'

bers may recover while others may not does not make their interests antagonistic. *Id.*

We also believe *Redland's* elements present common question of law and fact. Below, we address each of these elements.

All plaintiffs were exposed to greater than normal background levels because there are no background levels of dexfenfluramine or fenfluramine exposure. Additionally, whether dexfenfluramine and fenfluramine are hazardous is common to all class members. Discovery may reveal that the diet drugs are hazardous only if consumed for a certain duration and in a certain amount. However, the class certification is not the place to determine at which dosage and for what duration the diet drugs become hazardous. Nevertheless, plaintiffs contend that at any dose and for any duration the drugs are hazardous because the drugs have been withdrawn from the market and federal agencies responsible for protecting the public health and plaintiffs' experts have recommended that any person who has consumed fenfluramine or dexfenfluramine requires medical monitoring.

The recommendations of the government, public health agencies and plaintiffs' experts also create a common issue of whether their recommended medical monitoring program is different from that normally recommended in the absence of exposure. Plaintiffs' experts stated that the medical program they recommend (*i.e.* EKG echocardiogram, medical history, physical examination x-ray) is not normally recommended in the absence of exposure. Stolley declaration at ¶14; Gelb declaration at ¶11. Furthermore, *Redland* requires that the

---

omission to the FDA caused all class members' exposure to the diet drugs.

recommended monitoring program be compared with what is normally recommended for the general population, not a particular individual. *Redland* at 195-96, 696 A.2d at 146-47. In *Redland,* the court compared the American Cancer Society's "Recommendations for the Early Detection of Cancer in Asymptomatic People" with plaintiffs' experts' recommendation for detection of cancer in persons who lived near or played on fields which contained hazardous substances. *Id.* The court held that plaintiffs' experts' recommended monitoring regimen was sufficiently different from that normally recommended for the general population of asymptomatic and unexposed persons to withstand summary judgment on that element. Here, plaintiffs' experts' monitoring regimen for the entire class must be compared with what is recommended for asymptomatic persons who have not been exposed to dexfenfluramine or fenfluramine. Ultimately, some class members may not be entitled to the medical monitoring program because the recommended protocol does not differ from the program they received before their exposure. That is, a plaintiff's current monitoring program is sufficient to detect and diagnose valvupathy, PH and PPH. Therefore, the plaintiff will not incur any additional medical expenses because of defendants' negligence. We believe this circumstance raises "individual questions [which are] essential to a class member's recovery [but] not necessarily fatal to the class." *Janicik,* 305 Pa. Super. at 133, 451 A.2d at 457.

The other elements relating to the monitoring regimen: whether a monitoring procedure exists that makes the early detection of the disease possible; and whether the monitoring regimen is reasonably necessary according to contemporary scientific principles, raise common questions. The recommended monitoring regimen plain-

tiffs have proposed applies to all class members, regardless of plaintiffs' dosage or duration of use. Therefore, it may be decided class-wide whether the recommended monitoring regimen satisfies *Redland's* elements relating to the medical monitoring protocol.

The remaining *Redland* element: whether plaintiffs are at an increased risk of contracting a serious latent disease, also raises common questions. We agree with defendants that a plaintiff's risk depends on the amount of diet drugs they consumed, the duration of diet drug use and plaintiff's prior medical history. However, we are confident that plaintiffs' experts can group persons according to these characteristics and determine that the group is at a significant risk of developing PH, PPH or valvupathy.[14] Our confidence is not without foundation, as the Third Circuit has explained that it is possible and permissible for an expert to opine that a group of plaintiffs, as opposed to each individual in the group, may have a significantly increased risk of contracting disease:

---

14. Statistical evidence may also be used to account for individual differences within the group. In order to pinpoint a disease's actual source, statisticians use "individual attribution characteristics" (also known as "risk ratios") to determine the percentage of risk caused by defendant's conduct and the risk caused by factors other than defendant's actions. For example, if there are three possible sources of plaintiff's disease, and it is determined that plaintiff is 35 percent likely to have contracted the disease by defendant's conduct, then defendant pays 35 percent of plaintiff's total damages. By using risk ratios, the court is able to insure that a defendant compensates a plaintiff according to the risk of disease caused by defendant's actions. Jesse Lee, *Medical Monitoring Damages: Issues Concerning the Administration of Medical Monitoring Programs,* 20 Am. J. L. and Med., 251, 254 (1994).

"[W]here experts individualize their testimony to a group of individuals with a common characteristic (*i.e.* levels of exposure to chemical X above Y amount, we do not think there is a need for greater individualization so long as they testify that the risk to each member of the group is significant. We fail to see the purpose in requiring greater individualization. Nor do we think that an expert must quantify the increased risk." *In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 788 (3d Cir. 1994), *cert. denied,* 513 U.S. 1190 (1995).

To summarize, the common issues of defendants' promotion and sale of dexfenfluramine and fenfluramine; defendants' alleged knowledge about and promotion of the non-FDA-approved use of these drugs with phentermine; whether dexfenfluramine and/or fenfluramine are hazardous; and whether the proposed monitoring regimen differs from that normally recommended for the general population, predominate over the individual issues of a class member's medical and prescription history and pre-exposure monitoring regimen. These individual questions may ultimately affect a class member's right to recovery, but are not fatal to the class. In addition, the court relies on its inherent power to modify the class if subsequent evidence reveals that dexfenfluramine or fenfluramine are hazardous only if consumed in certain doses and for certain durations. At that point, the court could modify the class based on that evidence because "[t]he court may alter, modify, or revoke certification if later developments in the litigation reveal that some prerequisite to certification is not satisfied." *Janicik,* 305 Pa. Super. at 129, 451 A.2d at 455; *Cambanis,* 348 Pa. Super. at 46, 501 A.2d at 638.

### 3. *Typicality*

Plaintiffs must also demonstrate that their "claims or defenses . . . are typical of the claims or defenses of the class." Pa.R.C.P. 1702(3). This factor requires that "the class representative's overall position on the common issues is sufficiently aligned with that of the absent class members to ensure that her pursuit of her own interests will advance those of the proposed class members." *D'Amelio,* 347 Pa. Super. at 458, 500 A.2d at 1146; *Janicik,* 305 Pa. Super. at 134, 451 A.2d at 457; *Ablin,* 291 Pa. Super. at 47, 435 A.2d at 212. See also, 1 Newberg on Class Actions §1115a.[15]

Plaintiffs argue that the class representatives' claims are typical of other class members' claims because their claims arise out of the same course of conduct by the defendants, involve the same legal theories, and do not raise divergent goals or interests. Plaintiffs emphasize that defendants' conduct does not vary from plaintiff to plaintiff; defendants allegedly failed to disclose material information about the diet drugs' side effects; consequently, the FDA approved the drugs, and as a result of the approval, plaintiffs consumed the drugs and now require medical monitoring. Individual issues of class members' medical history, prior medical monitoring, amount and duration of diet drug consumption, plaintiffs argue, affect the extent of medical monitoring plaintiffs will ultimately receive but not "whether

---

15. "Self-interest, the motivating force that sparks the adversary system, also sustains the doctrine of class actions. We may trust man to help his fellow man if by doing so he helps himself—particularly if *only* by helping others will he be able to protect and promote his own interests. . . . Our system of justice tolerates and at times favors litigation through champions who stand or fall with the whole group." (emphasis in original)

such monitoring should be done and who should pay for it." Pls.' reply at 51.

Defendants respond that the class representatives' claims are not typical of other class members' because of differences in plaintiffs' medical history and amount, type and duration of diet drug use and prior medical monitoring. Essentially, defendants argue that the differences between class representatives and the putative class renders the class representatives atypical.

Defendants also challenge the class representatives' typicality by arguing that plaintiffs' proposed class definition encompasses persons who have an actual injury as well as those without any legally cognizable injury. This pairing is incompatible, defendants claim, because it effectively splits plaintiffs' causes of actions. According to defendants, class members with current injuries (*e.g.* valvupathy, PH or PPH) have a "cognizable claim for damages while those who have no current symptoms have no cause of action for damages and can sue only for medical monitoring." AHP opp'n mem. at 66. Thus, defendants argue that plaintiffs with actual injuries who join plaintiffs' class suit jeopardize their ability to recover for actual injuries.

The court agrees with defendants that under plaintiffs' proposed class definition, the class representatives' claims are not typical of those belonging to absent class members because the class' claims do not protect symptomatic plaintiffs' right to bring a personal injury action. However, our decision to include in the class only asymptomatic persons, makes plaintiffs' claims typical of those belonging to, and necessary for the protection of, absent members of the proposed class. Our reasoning follows.

Symptomatic plaintiffs have a personal injury action to recover for their manifest physical injuries (*i.e.* PH,

PPH and/or valvupathy). Asymptomatic plaintiffs, by contrast, do not have a personal injury action because they do not have a sufficient physical injury to recover personal injury damages.[16] *Simmons v. Pacor Inc.*, 543 Pa. 664, 679-80, 674 A.2d 232, 239-40 (1996). Because this class suit involves only a claim for medical monitoring, it is an inappropriate means for symptomatic plaintiffs to seek compensation for their physical injuries. If symptomatic plaintiffs fail to opt-out, they jeopardize their right to bring an action for their physical injuries because they are bound by any judgment entered in a certified class suit in which they are encompassed by the class definition. Pa.R.C.P. 1715. Plaintiffs' proposed class encompasses symptomatic plaintiffs because symptomatic plaintiffs "used dexfenfluramine and/or fenfluramine." Therefore, a symptomatic plaintiff who does not opt-out, and then tries to institute a personal injury action, will likely have his or her personal injury suit dismissed for having impermissibly split a cause of action. *Kessler v. Old Guard Mutual Insurance Co.*, 391 Pa. Super. 175, 182, 570 A.2d 569, 573 (1990) ("The law does not permit the owner of a single cause of action to divide or split that cause so as to make it the subject of several actions."). Symptomatic plaintiffs who fail to opt-out of the class suit and later attempt to bring an action for personal injury have split their causes of action because they brought a medical moni-

---

16. Defendants incorrectly describe as "uninjured" plaintiffs who have not been diagnosed with PH, PPH or valvupathy but who may have a claim for medical monitoring. A plaintiff's injury in a medical monitoring claim is the cost of regular medical testing and evaluation the plaintiff must undergo in order to detect the injury which plaintiff is at an increased risk of getting because of defendants' negligence. *Simmons v. Pacor Inc.*, 543 Pa. 664, 679-80, 674 A.2d 232, 239-40 (1996).

toring action in a class suit and a personal injury action in an individual suit.

The court cures this potentially debilitating defect in plaintiffs' class definition by redefining the class to include only asymptomatic persons.[17] This modification prevents symptomatic persons from later being told by a court that they have impermissibly split their cause of action, and from inadvertently foregoing their right to recover for physical injuries which may have been caused by defendants' negligence.[18] Under the revised class definition, the court must now determine whether the class representatives' claims are typical of other class members' claims.

We find that the class representatives' claims are typical of absent class members' claims because the representatives' claims arise from same or similar conduct by the defendant and their interests do not diverge from, or are adverse to, the interests of absent class members. The representatives' claims arise from defendants' al-

---

17. Placing symptomatic plaintiffs with asymptomatic plaintiffs is also problematic because their interests in the trust fund are antagonistic. Symptomatic plaintiffs have a short-term interest in the fund's solvency because they have large and immediate expenses. Asymptomatic persons, by contrast, have a long-term interest in the solvency of the fund because they require only periodic testing and evaluation.

18. Asymptomatic plaintiffs who do not opt-out and later develop PH, PPH or valvupathy have not impermissibly split their cause of action. Medical monitoring claims are divisible from personal injury claims if the plaintiff, at the time of instituting his or her medical monitoring action, has not developed a physical injury. See *Simmons,* 543 Pa. at 674, 674 A.2d at 236 (observing that asymptomatic plaintiffs exposed to asbestos are not "precluded from subsequently commencing an action for an asbestos-related injury when symptoms develop and physiological impairment begins.").

leged failure to warn about the association between dexfenfluramine and fenfluramine consumption and heart valve problems. Plaintiffs press the same core theory about defendants' liability: that defendants failed to disclose to doctors, the FDA, and the public, the association between dexfenfluramine and fenfluramine consumption and heart valve problems, and, as result of this non-disclosure, the diet drugs were available on the market and were consumed by the plaintiffs, thereby increasing their risk of developing PH, PPH and/or valvupathy. All plaintiffs were exposed to dex-fenfluramine and fenfluramine and claim to need medical monitoring. Therefore, the class' claims coalesce around their shared interest in obtaining recovery for medical expenses necessitated by defendants' alleged negligence. The likelihood that each member will have varying levels of medical monitoring expenses due to varying levels of exposure and differing medical history does not render the representatives' and absent class members' claims antagonistic or divergent because all members of the class have an interest in obtaining recovery for medical expenses caused by defendants' negligence. As a result, we find that the typicality requirement is satisfied.

## 4. *Adequacy of Representation*

For the class to be certified, this court must also conclude that the plaintiffs "will fairly and adequately assert and protect the interests of the class." Pa.R.C.P. 1702(4). Adequate representation is evaluated under considerations set forth in Pennsylvania Rule of Civil Procedure 1709, which provides:

110

*"Rule 1709: Criteria for certification. Determination of fair and adequate representation*

"In determining whether the representative parties will fairly and adequately [represent] the interests of the class, the court shall consider among other matters

"(1) whether the attorney for the representative parties will adequately represent the interests of the class,

"(2) whether the representative parties have a conflict of interest in the maintenance of the class action, and

"(3) whether the representative parties have or can acquire adequate financial resources to assure that the interests of the class will not be harmed."

Rule 1709 is not the place to re-visit issues and re-hash arguments raised during the discussion of Rule 1702's commonality and typicality requirements. Instead, "the three criteria . . . require the lower court to consider evidence and find facts *distinct from* those necessary in its determination regarding the requisites of commonality and typicality." See *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa. Super. 441, 461, 500 A.2d 1137, 1147 (1985). (emphasis added)[19] Accordingly, the

---

19. Examples of distinct issues and facts that the court should address under this provision are: the adequacy of plaintiffs' counsel's representation during the litigation, *Klusman v. Bucks County Court of Common Pleas,* 128 Pa. Commw. 616, 564 A.2d 526 (1989), *aff'd,* 524 Pa. 593, 574 A.2d 604 (1990) (finding as relevant under Rule 1709 that counsel failed to move promptly for class certification, adhere to court orders, follow court procedure by filing summary judgment before the court had ruled on certification and candidly advise court of class representative's death); or plaintiff's counsel's dual role as class representative and class counsel. *Murphy v. Harleysville Mutual Insurance Co.,* 282 Pa. Super. 244, 422 A.2d 1097 (1980), *cert. denied,* 454 U.S. 896.

court will only address arguments that are distinct from those made under typicality and commonality.[20]

In response to the first factor, generally, "until the contrary is demonstrated, courts will assume that members of the bar are skilled in their profession." *Janicik,* 305 Pa. Super. at 136, 451 A.2d at 458, citing *Dolgow v. Anderson,* 43 F.R.D. 472, 496 (E.D.N.Y. 1968). Because defendants have not raised this issue and plaintiffs' counsel's extensive experience in litigating class suits is well-known, the court is confident that plaintiffs are adequately represented.

With regard to the second factor, "courts have generally presumed that no conflict of interest exists unless otherwise demonstrated, and have relied upon the adversary system and the court's supervisory powers to expose and mitigate any conflict." *Janicik,* 305 Pa. Super. at 136, 451 A.2d at 459, citing *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3d Cir. 1975). When there is no allegation of impropriety between plaintiff and his counsel, a finding of conflict that would prevent certification is inappropriate. See *Murphy v. Harleysville Mutual Insurance Co.,* 282 Pa. Super. 244, 422 A.2d 1097 (1980); *Kramer v. Scientific Control Corp.,* 534 F.2d 1085 (3d Cir. 1976). The court presumes that no conflict of interest exists because the defendants have not raised this issue in their briefs or at oral argument, nor is the court aware of any conflict of interest.

Finally, as to the adequacy of plaintiffs' ability to fund the litigation, an affidavit of counsel that it will advance the necessary costs is all that is required.

---

20. Under Rule 1709, defendants argue that the class representatives are inadequate because of their varying medical and prescription drug history and the variety of representations they received from doctors and defendants.

*Janicik,* 305 Pa. Super. at 137-38, 451 A.2d at 459-60; *Haft v. U.S. Steel Corporation,* 305 Pa. Super. 109, 116, 451 A.2d 445, 448 (1982). Advancing costs is consistent with the Rules of Professional Conduct 1.8(e)(1) which "permit a lawyer to advance court costs and the expenses of litigation, the repayment of which can be contingent on the outcome of the matter." See *Wagner v. Anzon Inc.,* Phila. C.C.P. June Term, no. 8706- 4420, July 31, 1990 opinion of J. Prattis. Defendants have not raised this issue in their briefs or at oral argument, and we are confident that plaintiffs have secured adequate financial resources to fund this litigation.

Having considered the Rule 1709 factors and the issues raised at our certification hearing, this court finds that the class will be fairly and adequately represented.

### 5. *Fair and Efficient Method for Adjudication*

Finally, the court must consider whether allowing plaintiffs to proceed with adjudication of this suit as a class action would be both fair and efficient. The factors to be evaluated are set forth in Pennsylvania Rule of Civil Procedure 1708 as follows:

*"Rule 1708: Criteria for certification. Determination of class action as fair and efficient method of adjudication*

"In determining whether a class action is a fair and efficient method of adjudicating the controversy, the court shall consider among other matters the criteria set forth [below].

"(a) Where monetary recovery alone is sought, the court shall consider

"(1) whether common questions of law or fact predominate over any question affecting only individual members;

"(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;

"(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of

"(i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incompatible standards of conduct;

"(ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

"(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;

"(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;

"(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions; [and]

"(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action."

"In determining fairness and efficiency, the court must balance the interests of the litigants, [both] present and absent, and of the court system." *Janicik,* 305 Pa. Super.

at 141, 451 A.2d at 461. Courts should strike this balance mindful that the class action is inherently a "procedural device designed to promote efficiency and fairness in handling large numbers of similar claims." *Janicik,* 305 Pa. Super. at 141, 451 A.2d at 461, citing *Lilian v. Commonwealth,* 467 Pa. 15, 21, 354 A.2d 250, 253 (1976).

Defendants' main argument that it would be unfair and inefficient to certify plaintiffs' claim as a class action is that plaintiffs' claims do not satisfy the commonality or typicality requirements because of the individual nature of their claims. The concerns raised by this assertion were addressed and diffused in our analysis of typicality and commonality.

Pursuing the same argument through a different provision in the rules, defendants argue that a trial would be unmanageable because "there are no case management tools that would eliminate the need for individual trials on the issue of causation, reliance and damages." Interneuron opp'n mem. at 45. In discussing the commonality and typicality of plaintiffs' claims, the court disagreed with defendants because we determined that liability could be determined class-wide. Defendants' arguments are really aimed at the extent and duration of the diagnostic monitoring plaintiffs may ultimately receive. This issue will be decided by medical professionals and handled by a claims administrator. Additionally, the court will "rely on the ingenuity and aid of counsel and upon [our] plenary authority to control the action to solve whatever management problems the litigation [might] bring." *Janicik v. Prudential Insurance Co.,* 305 Pa. Super. at 142, 451 A.2d at 462.

Another argument defendants raise against certification is that plaintiffs' recovery is likely to be so small in relation to the expense and effort of administering

the action that class certification is not justified. The court disagrees because each plaintiff's potential expenses for medical monitoring are large enough to justify class certification. Plaintiffs' experts recommend that each plaintiff who has ingested fenfluramine or dexfenfluramine undergo a medical history, physical examination, chest x-ray, electrocardiogram and echocardiogram. Pls.' exhibit C, declaration of Ira J. Gelb M.D. at ¶11; pls.' exhibit D, declaration of Gilbert E. D'Alonzo M.D. at ¶12. Thus, to comply with the recommended monitoring program, each class member will incur medical expenses for at least five different medical services. Therefore, this court is convinced that plaintiffs' recovery is not so small in proportion to the expense of administering the action that proceeding on a classwide basis would be unfair and inefficient. *Kelly v. County of Allegheny,* 519 Pa. 213, 546 A.2d 608 (finding, where class members' average claims were $13.61, that discovery expenses would not absorb a disproportionate amount of class recovery, that class action would be unfair and inefficient).

However, we do not believe that a plaintiff's potential recovery is sufficiently large to support separate actions because of the expense of litigating a medical monitoring claim. To make out a medical monitoring claim, plaintiffs are required to support each element with substantial expert testimony. A plaintiff who successfully proves each element will only be entitled to a limited amount of damages—expenses incurred in monitoring the condition for which they are at an increased risk of getting because of defendants' negligence. See *Redland* at 189 n.6, 696 A.2d at 143 n.6 (quoting *Ayers v. Township of Jackson,* 525 A.2d 287, 314 (N.J. 1987)). Given the prospect of a limited damage award, an asymptomatic plaintiff who brings an individual medical moni-

toring claim is likely affluent and profligate. Furthermore, plaintiffs with smaller—but not less meritorious—claims will likely not pursue individual actions. Realistically, a class action is the only means asymptomatic plaintiffs have to recover medical monitoring expenses.

There are other considerations, not yet addressed, that contribute to the propriety of certifying this class. Below, we analyze 1708(a)(3) (*i.e.* risk of inconsistent adjudications) and the remaining provisions of Rule 1708.

Finding a risk of inconsistent adjudication is a "forceful argument in support of the approval of a class action." *Janicik,* 305 Pa. Super. at 143, 451 A.2d at 464 (quoting explanatory note to Pa.R.C.P. 1708); *Cambanis v. Nationwide Insurance Co.,* 348 Pa. Super. 41, 53, 501 A.2d 635, 641 (1985). Even where the risk of inconsistent adjudications has been small, courts have approved of a class action as a means to alleviate that risk. *Janicik,* 305 Pa. Super. at 143, 451 A.2d at 462, accord *Cambanis,* 348 Pa. Super. at 54, 501 A.2d at 641-42. In *Janicik,* the Superior Court determined that a small risk of inconsistent adjudication is a sufficient factor which weighs in favor of certifying plaintiffs' claims. The lower court in *Janicik* found that there was little risk of inconsistent adjudications because plaintiffs' claims involved "fundamental contract principles" and "identical contract language." *Id.* The Superior Court rejected that finding and stated that "even a small risk of inconsistent adjudication is unnecessary." *Id.*

Courts are unwilling to tolerate a small risk because inconsistent adjudications harm plaintiffs, defendants and the judicial system. Inconsistent adjudications harm plaintiffs because "[t]he precedential effect of a decision [has] a chilling effect on the assertion of similar claims, and combined with the expiring of statutes of limitation, may often 'substantially impair or impede' potential

litigants' ability to protect their interests." *Janicik,* 305 Pa. Super. at 143, 451 A.2d at 462. In cases where plaintiffs' potential recoveries vary considerably, there is a special risk that "[r]equiring the litigation to proceed as separate actions might effectively preclude those with the smallest claims from proceeding at all." *Haft v. United States Steel Corp.,* 305 Pa. Super. 109, 118, 451 A.2d 445, 450 (1982). Such a result is unacceptable if plaintiffs' claims prove meritorious because it results in "unjust enrichment to [defendant] and deprivation to many potential class members." *Id.* at 119, 451 A.2d at 450. Defendants are also harmed by inconsistent adjudications because such decisions impose incompatible standards of conduct upon defendants. *Janicik,* 305 Pa. Super. at 143, 451 A.2d at 462. Courts are harmed by separate adjudications because individual suits "unnecessarily clog court dockets with repetitive litigation." *Id.* at 145, 451 A.2d at 463.

Here, there is a large risk of inconsistent adjudications which could chill plaintiffs' assertion of similar claims, impose incompatible standards of conduct on defendant and overburden the judicial system. Unlike the claims in either *Janicik* or *Cambanis,* plaintiffs' claims involve a nascent and novel tort, requiring expert medical and epidemiological testimony to support its seven elements. *Redland* at 196, 696 A.2d at 146. Considering the complexity and magnitude of the issues and facts in this case, there is plenty of information to confound and confuse the most prepared and intelligent judge or jury, consequently leading to inconsistent adjudications. Moreover, if this action proceeds individually, plaintiffs' entitlement to a medically monitoring trust fund will vary substantially. For example, some judge or jury may determine that dexfenfluramine and fenfluramine are hazardous only if plaintiff consumed two pills a

day for three months, while another judge or jury may determine the dangerous dose and duration to be one pill a day for two months. Thus, in one jurisdiction, a plaintiff who took one pill a day for two months gets medical monitoring, while another plaintiff who consumed larger amounts of the diet drugs and for a longer period of time gets nothing. The inconsistency in rulings combined with the expense of litigating a medical monitoring claim will likely dissuade a plaintiff from bringing an individual medical monitoring claim.

Separate medical monitoring actions not only harm the plaintiffs but also the defendants and the judicial system. Like plaintiffs whose entitlement to the trust fund will vary, defendants will be faced with incompatible standards of conduct, depending on the quality and quantity of information the judge or jury determines that defendants should have disclosed about the diet drugs' side effects. Courts are harmed because individual actions would require the court to establish separate trust funds. *Redland* requires courts to "establish procedures for the submission, review and payment of claims for the costs of medical monitoring." *Id.* at 198 n.9, 696 A.2d at 147 n.9. Thus, if individual plaintiffs prevail, each court would be required to establish and administer separate trust funds for each plaintiff. Under a certified class suit, by contrast, one court would likely establish the procedures and administer the fund. Similarly, a class action enables plaintiffs and defendants to pool all the available medical and epidemiological data. Pooling all available data leads to a more informed judgment by the judge or jury. Thus, a class action, in this context, is not only efficient but fair. Therefore, we determine that separate medical monitoring actions inefficiently use judicial resources and pose a large risk of inconsistent adjudications.

Below, we address the remaining provisions of Rule 1708 that the court has not yet considered.

Class members can be readily identified by their medical and prescription records. The court has not been advised that other litigation has been commenced against defendants which involve the same issues. Philadelphia County is the appropriate forum for litigating plaintiffs' claims because the class is limited to Pennsylvania residents, concentrating the action in one forum promotes judicial economy and "there is no one common pleas court which would be better to hear the action . . . ." *Cambanis v. Nationwide Insurance Co.,* 348 Pa. Super. at 53 n.19, 501 A.2d at 641 n.19. Finally, class representatives have shown sufficient evidence of honesty, willingness to pursue the matter and knowledge of facts underlying the action that we are persuaded to allow this action to proceed. See *Janicik,* 305 Pa. Super. at 141, 451 A.2d at 461.

Having weighed the Rule 1708(a) factors, this court finds that a class action is a fair and efficient method for adjudicating plaintiffs' medical monitoring claims. Accordingly, this court makes the following conclusions of law.

## IV. CONCLUSIONS OF LAW

(1) The class is sufficiently numerous that joinder of all its members would be impracticable.

(2) There are questions of law or fact common to the class.

(3) The claims raised by Michael Ciocco, Christine Gazillo and Dennis McBride are typical of those claims belonging to absent class members.

(4) Plaintiffs Ciocco, Gazillo and McBride and their counsel will fairly and adequately assert and protect the interests of the class under the criteria set forth in Pa.R.C.P. 1709.

120

(5) Allowing this suit to proceed as a class action provides a fair and efficient method for adjudication of the criteria set forth in Pa.R.C.P. 1708.

As a result of the foregoing, we enter the attached order.

## ORDER

And now, March 12, 1999, in consideration of plaintiffs' motion for class certification, defendants' memoranda of law in opposition to plaintiffs' motion for class certification and all submissions thereto, it is hereby ordered that the above-captioned action is certified as a class action for the claim of medical monitoring. The class shall consist of:

"All residents of the Commonwealth of Pennsylvania who have used fenfluramine (sometimes referred to as 'Pondimin') and/or dexfenfluramine (sometimes referred to as 'Redux') and who have not been diagnosed with primary or pulmonary hypertension or valvupathy."

The parties shall submit proposals for a notification procedure and proposed forms of notice for class members within 30 days from the date of this order.

Plaintiffs Michael Ciocco, Christine Gazillo and Dennis McBride shall serve as class representatives.